UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| KYANA FENNELL and | § | |
| LAWANDA FENNELL-KINNEY, | § | |
| as Next Friend of | § | |
| KYRIANNA ADAMS FENNELL | § | |
| and KAVIN JOHNSON, | § | Cv. No. SA:12-CV-00941-DAE |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| MARION INDEPENDENT SCHOOL | § | |
| DISTRICT; GLENN DAVIS, | § | |
| individually; ASHLEY SMITH, | § | |
| individually; and CYNTHIA MANLEY, | § | |
| individually, | § | |
| | § | |
| Defendants. | § | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
SECOND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

On June 21, 2013, the Court heard oral argument on Defendants'

Second Motion to Dismiss for Failure to State a Claim.  (Doc. # 18.)  R. Chris

Pittard, Esq., appeared on behalf of Plaintiffs; Craig Wood, Esq., and Stacy

Castillo, Esq., appeared on behalf of Defendants.  After reviewing the Motion and

the supporting and opposing memoranda, and in light of the parties' arguments at

the hearing, the Court, for the reasons that follow, **GRANTS IN PART AND**

**DENIES IN PART** Defendants' Motion.

<u>BACKGROUND</u>

I.      <u>Factual Allegations</u>

Plaintiff Kyana Fennell ("Kyana"), age 18, is a former student of the Marion Independent School District ("Marion ISD") and an African-American. (Doc. # 4 at 4.)  Plaintiff Lawanda Fennell-Kinney ("Ms. Fennell-Kinney") is Kyana's mother and next friend of Plaintiffs Kyrianna "Kyra" Adams Fennell ("Kyra") and Kavin Johnson ("Kavin"), her minor children who are also African-American and former students of the Marion ISD.  (<u>Id.</u>)

Kyana, Kyra, and Kavin each attended school in the Marion Independent School District beginning in the first grade and continuing through the 2011–2012 academic school year.  (SAC ¶ 11.)  Plaintiffs allege that as early as 2008, Kyana, Kyra, and Kavin "began experiencing racially-based comments, taunts and electronic images sent via cell phone texts and on social media websites such as Facebook."  (<u>Id.</u> ¶ 13.)  In that year, Kyra allegedly received a text message from a white classmate that contained an animation of the Klansmen of the Ku Klux Klan swinging a noose to the tune of a song that was popular at the time. (<u>Id.</u>)  Kyra "confronted" the classmate and was suspended for three days.  (<u>Id.</u>) While the school's principal allegedly "was made aware of the situation involving the text . . . no action was taken against the white classmate."  (<u>Id.</u>)  Kyra was

allegedly subjected to racial slurs and comments from 2008 through the 2011–2012 academic year, "but no action [was] taken against the white students."  (Id.)

Plaintiffs allege that in February 2011, one white girl and two Hispanic girls surrounded Kavin at her locker and began taunting her.  (Id. at 14.) When Kavin tried to extricate herself from the situation, at least one of the girls punched her and threw her back against her locker.  (Id.)  The school suspended Kavin and one of the Hispanic girls based on this incident but "took no action against [Kavin's] white attacker."  (Id.)  The principal allegedly "refused to conduct an investigation into the incident until after Kavin had completed the disciplinary action and then determined that, in fact, Kavin [had been] acting in self-defense."  (Id.)  However, the school took no additional action against Kavin's aggressors, allegedly claiming that "the 'time period' had passed to take action." (Id.)

On numerous occasions from 2011 to 2012, Kavin allegedly reported to the Marion Middle School principal, Mr. Wendel, and later to Ms. Kelley Walters, that multiple white classmates had called her such names as "blackie," "black girl," and "nigger."[1]  (Id. ¶ 15.)  During her seventh-grade year, after a classmate told a "black" joke, Kavin allegedly reported the incident to her teacher,

Mr. Alferbacht, and also to the assistant principal, Ms. Walters.  (Id.)  However, Plaintiffs allege that the school took no action.  (Id.)

Plaintiffs allege that when Kavin tried out for the middle school's cheerleading team, white classmates told her that "black girls weren't pretty enough to be cheerleaders" and that she "looked like a boy."  (Id. ¶ 15.)  Although Kavin made the cheerleading team, she was allegedly "excluded from cheerleader activities sponsored by many of her white classmates, and ostracized by her teammates."  (Id.)

When Kyana was in kindergarten, a white boy allegedly called her a "nigger."  (Id. ¶ 16.)  While Kyana was disciplined for punching the boy in retaliation, the school allegedly took no action against him for his racial slur.  (Id.)  Similarly, Plaintiffs allege that the school took no action against a white classmate who called Kyana a "nigger" in middle school or a white classmate who called Kyana a "stupid nigger" in high school.  (Id.)

In high school, the white athletic director, Defendant Glenn Davis, allegedly "admonished" Kyana "for her 'ethnic' hairstyles, when she was required to wear her hair in 'micro-braids' because of damage to her hair."  (Id. ¶ 16.)  By contrast, Plaintiffs allege that "[w]hite students who wore their hair in different

---

[1] The Court repeats these racial epithets herein only because they are essential to an

shades of colors, like purple, red, or green, were not similarly rebuked or admonished." (Id.)

On January 17, 2012, a white coach and teacher, Defendant Ashley Smith, allegedly told Kyana that she was a "bad influence" because she had had a child at the age of seventeen. (Id. ¶ 17.) Plaintiffs allege that Defendant Smith made this comment in front of other white students but "has never been heard to make such comments to her white students, regardless of what problems or trouble they may have experienced." (Id.)

The SAC also describes an incident wherein Justin Farris, fiancé of Defendant Smith, allegedly confronted Plaintiff Lawanda Fennell-Kinney at the Guadalupe County Youth Show in such a "hostile and aggressive manner" that the security guards escorted him from the building. (Id. ¶ 18.) Plaintiffs allege that Mr. Farris was responding to a Facebook post in which Ms. Fennell-Kinney had described, though without naming Defendant Smith, the comment Smith had made to Kyana about being a "bad influence." (Id.) The SAC describes Ms. Fennell-Kinney's fear for Kyana's safety, her meeting a few days later with various school administrators and Defendant Glenn Davis, the administrators' decision that Mr. Farris would not be permitted to attend that night's basketball

---

understanding of the Plaintiffs' claims.

game, and the decision that Defendant Smith would not coach that game.  (Id.)

Several students, including Justin Farris's sister, allegedly "harassed" Kyana the

following day.  (Id.)

On February 6, 2012, Ms. Fennell-Kinney allegedly discovered a

noose and a racially hostile note next to Kyana's car.  The note allegedly said:

> Die fuckin "nigger sisters"....Bitches!!!
> You can never bring our families down...
> Whites will always rule this town and this school!!!!
> Damn spooks!!!!
> So go ahead and file your stupid damn complaints and grievances.....
> NIGGERS.....and that "Nigger lover" you have a baby with.....

(Id. ¶ 19.)  Plaintiffs reported this incident to the Marion ISD police, the Marion

Police Department, and eventually the FBI.  (Id.)  However, "there were no

suspects and no arrests," because "[t]he video surveillance equipment for the

parking lot somehow failed to show any activity around Kyana's car in the relevant

time period."  (Id.)  One of the cars parked next to Kyana's car belonged to the

same boy who had allegedly called Kyana a "stupid nigger" and who had not been

punished by the school.  (Id.)  Plaintiffs allege that he was seen staring at Kyana

from inside the car before practice and before the noose was found.  (Id.)  After the

incident, Plaintiffs allege that he "was heard to brag . . . that 'He would love to

shake the hand of the person who did it' . . . ."  (Id.)  However, "no one was

charged with the hate crime."  (Id.)

Plaintiffs allege that during the spring semester of the 2010–2011 school year, white classmates called Doug Giles, a ward of Plaintiff Lawanda Fennell-Kinney, a "nigger."  (Id. ¶ 20.)  On January 6, 2012, Giles allegedly wrote in a statement that someone had hung a noose by his locker and reported the incident to the athletic director, Defendant Glenn Davis.  (Id.)  Defendant Davis allegedly responded to the incident by telling the team to "knock it off."  (Id.)  Plaintiffs allege that the school did not investigate the incident and did not report it to Ms. Fennell-Kinney until February 4, 2012.  (Id.)

Following these incidents, Ms. Fennell-Kinney allegedly filed a Level I grievance with the school district, complaining about the racial harassment from teachers, coaches, administrators, and other students that her children had experienced at the school.  (Id. ¶ 22.)

On April 17, 2012, Kyra's softball team, coached by Defendant Cynthia Manley, had a game in Lulling, Texas.  (Id. ¶ 23.)  Plaintiffs allege that the team members were given a form telling them to report to the school at 2:55 pm for a 3:05 pm departure.  (Id.)  Kyra, who had signed out of school for lunch that day, allegedly arrived at 2:55 pm to find the bus departing without her.  (Id.)  Plaintiffs allege that, although Defendant Manley could see Kyra waving at the stop sign, she refused to stop the bus.  (Id.)  Another parent drove Kyra to the

game, but Defendant Manley refused to start Kyra, allegedly stating that, because Kyra had signed out of school for lunch on a game day and Manley had not known where she was, she could not start.  (Id.)  Ms. Fennell-Kinney took Kyra home, leading Defendant Manley to threaten to officially reprimand Kyra for leaving a game early.  (Id.)  As punishment, Manley allegedly made Kyra sit out the next game.  (Id.)  Plaintiffs allege that "on several occasions prior to this date, other white softball players had signed out for lunch on game day and had not been disciplined or otherwise singled out by Coach Manley."  (Id.)

Plaintiffs allege that on the day of the Lulling game, the softball team took a team photo without Kyra present.  (Id.)  Kyra's teammates allegedly joked that one of the girls in the photo, who appeared to have darker skin because she was in a shadow, was in fact Kyra.  (Id.)  The teammates allegedly made these comments in Defendant Manley's presence, but Defendant Manley did not react. (Id.)

On April 17, 2012, Kyra allegedly received a text message from a white teammate that relayed derogatory comments that other white teammates had made about Kyra's sister Kyana and about Kyana's child.  (Id.)  On April 19, 2012, there was a verbal confrontation between Kyana and two of Kyra's white teammates at the softball field, off campus, regarding those comments.  (Id. ¶ 24.)

While Defendant Manley did not witness the confrontation, Plaintiffs allege that she encouraged the white teammates to file unsubstantiated criminal charges against Kyana.  (Id.)

On May 16, 2012, Kyra allegedly went to Mr. Hernandez, a counselor at the high school, to ask him what she should do about her fourth-period class, which contained three white girls who had allegedly been harassing her.  (Id. ¶ 25.) Mr. Hernandez allegedly responded, "Go to class, sit down, and do your work." (Id.)  During fourth period, a white classmate intentionally bumped Kyra with her hip while Kyra was sitting at her desk.  (Id.)  Plaintiffs allege that when Kyra responded with "excuse you," Mr. Hernandez took her and the other girl out of the class and threatened them with suspension if the incidents continued.  (Id.) Plaintiffs further allege that Mr. Hernandez cautioned Kyra about the Facebook posting she had made about the three white girls.  (Id.)

On May 17, 2012, Daryl Kinney, Kyra's father, complained to Mr. Hernandez that Kyra was being singled out for punishment.  (Id.)  Mr. Kinney allegedly pointed out that the three white girls had taunted Kyra for a number of days prior to the May 16 incident and that Mr. Hernandez had taken no action after Kyra had reported two prior incidents of harassment.  (Id.)  Mr. Kinney also noted that the three white girls had made derogatory comments about Kyra on Facebook

and Twitter but that Mr. Hernandez—in contrast to his warning to Kyra about her Facebook posts—had said that the comments had not been made at school and were therefore "irrelevant."  (Id.)  Finally, Mr. Kinney pointed out that Mr. Hernandez had not taken any action to stop the confrontations between Kyra and the white girls until Kyra had responded verbally to their verbal and physical abuse.  (Id.)

On May 30, 2012, Plaintiffs allegedly presented their grievance—now a Level III grievance—to the entire Marion ISD Board of Trustees.  (Id. ¶ 26.) Plaintiffs allege that they each read a statement to the Board detailing "a history of the racial discrimination" to which they had allegedly been subjected during their time in the Marion ISD.  (Id.)  Ms. Fennell-Kinney cited several violations of District policy, including its "zero tolerance" policy for racial harassment.  (Id.) Ms. Fennell-Kinney requested (1) that the Board "updat[e] District policy to address the situation as presented by the Plaintiffs"; (2) "additional training for teachers and administrators concerning racially hostile environments and harassment"; and (3) that the Board stop "the retaliation and bullying of her children."  (Id.)  However, the Board allegedly stated that the policies in place and the training the teachers received were adequate, deciding not to take any further action.  (Id.)

After the Board decided not to take the action Plaintiffs requested, Ms. Fennell-Kinney removed Kyra and Kavin from the Marion ISD and enrolled them in the Schertz-Cibolo Independent School District instead.  (Id.)  Kyana graduated from Marion High School and is currently attending college.  (Id.)

II.    Procedural History

On October 4, 2012, Plaintiffs filed suit against the Marion ISD, Glenn Davis, Ashley Smith, and Cynthia Manley.  (Doc. # 1.)  In their First Amended Complaint (doc. # 4), filed October 15, 2012, Plaintiffs brought claims against the Marion ISD pursuant to Title VI of the Civil Rights Act and 42 U.S.C. § 1983.  (Id. ¶¶ 28–36.)  Plaintiffs also brought § 1983 claims against Defendants Davis, Smith, and Manley (collectively, the "Individual Defendants"), who were sued in both their individual and their official capacities.  (Id. ¶¶ 31–32.)

On November 7, 2012, Defendants timely filed a Motion to Dismiss for Failure to State a Claim.  (Doc. # 6.)  The Court heard oral argument on that Motion on January 23, 2013, granting it on January 28, 2013.  The Court dismissed with prejudice the claims against the Individual Defendants in their official capacity but dismissed the remaining claims without prejudice, granting Plaintiffs leave to file a Second Amended Complaint.  (Doc. # 13.)

11

On March 14, 2013, Plaintiffs filed a Second Amended Complaint. (Doc. # 15.)  On March 29, 2013, Defendants filed the Second Motion to Dismiss for Failure to State a Claim that is now before the Court.  (Doc. # 18.)  Plaintiffs filed a Response on April 17, 2013 (doc. # 21), and Defendants filed a Reply on April 29, 2013 (doc. # 23).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Review is limited to the contents of the complaint and matters properly subject to judicial notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  In analyzing a motion to dismiss for failure to state a claim, "[t]he court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  In re Katrina Canal Breaches Litig., 495 F.3d at 205 (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss.  See Twombly, 550 U.S. 544, 555–56 (2007).  In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action.  See id. at 556–57.  "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  Iqbal, 556 U.S. at 678 (internal quotations and citations omitted).  Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations."  Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").  When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court."  Twombly, 550 U.S. at 558 (citation omitted).

<u>DISCUSSION</u>

I.    <u>Plaintiffs' Section 1983 Claims against the Individual Defendants</u>

"To state a claim under 42 U.S.C. § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." <u>Doe ex rel. Magee v. Covington Cnty. Sch. Dist.</u>, 675 F.3d 849, 854 (5th Cir. 2012) (en banc). "'State employment is generally sufficient to render the defendant a state actor,'" and a defendant necessarily "acts under color of state law when he abuses the position given to him by the State." <u>West v. Atkins</u>, 487 U.S. 42, 49–50 (1988) (quoting <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 936 n.18 (1982)).

In this case, Plaintiffs allege that the Individual Defendants, while acting in their official capacity as teachers and coaches of the Marion ISD, violated Plaintiffs' rights under the Equal Protection Clause. (SAC ¶ 33.) "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV, § 1). Thus, "[t]o state a claim of racial discrimination under

the Equal Protection Clause and section 1983, the plaintiff 'must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'" Priester v. Lowndes Cnty., 354 F.3d 414, 424 (5th Cir. 2004) (quoting Taylor v. Johnson, 257 F.3d 470, 473 (5th Cir. 2001)).

The Individual Defendants seek dismissal of Plaintiffs' § 1983 claims based on the doctrine of qualified immunity.  (Doc. # 6 at 3.)  For the reasons that follow, the Court concludes Defendants Davis and Manley are not entitled to qualified immunity and denies Defendants' Motion to Dismiss as to the claims against those Defendants.  However, the Court finds that Defendant Smith is entitled to qualified immunity and dismisses with prejudice Plaintiffs' claims against her.

A.    The Qualified Immunity Standard

"[G]overnment officials performing discretionary functions [are entitled to] a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  Anderson v. Creighton, 483 U.S. 635, 638 (1987) (citations omitted).  In suits brought under federal law, government employees are presumptively entitled to the defense of qualified immunity, and

once the defense is asserted the burden shifts to the plaintiff to show that immunity does not bar recovery.  Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir. 1992); Bennett v. City of Grand Prairie, Tex., 883 F.2d 400, 408 (5th Cir. 1989).

The Supreme Court has described a two-part analysis for resolving government officials' qualified immunity claims.  First, a court must ask whether the defendant's conduct violated a constitutional right.  Terry v. Hubert, 609 F.3d 757, 761 (5th Cir. 2010) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).  Second, the court must determine whether the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the violation.  Id.  A court may begin its analysis with either prong, but both questions must be answered in the affirmative for liability to attach.  Pearson, 555 U.S. at 236.  Thus, "[e]ven if the official's conduct violate[d] a constitutional right, he is entitled to qualified immunity if the conduct was objectively reasonable." Rankin v. Klevenhagen, 5 F.3d 103, 105 (5th Cir. 1993) (quoting Spann v. Rainey, 987 F.2d 1110, 1114 (5th Cir. 1993)).

"One of the principal purposes of the qualified immunity doctrine is to shield officers not only from liability, but also from defending against a lawsuit." Jackson v. City of Beaumont Police Dep't, 958 F.2d 616, 620 (5th Cir. 1992) (citing Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,

954 F.2d 1054, 1057 (5th Cir. 1992)).  Because the doctrine is designed to protect

public officials from "the broad-ranging discovery that can be peculiarly disruptive

of effective government," questions regarding qualified immunity are resolved on

the face of the pleadings and with limited resort to pre-trial discovery.  Anderson v.

Creighton, 483 U.S. 635, 646 n.6 (1987) (internal quotations omitted); see also

Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th Cir. 1988) ("[A]llowing broadly

worded complaints[,] . . . which leaves to traditional pretrial depositions,

interrogatories, and requests for admission the development of the real facts

underlying the claim, effectively eviscerates important functions and protections of

official immunity.").  Accordingly, "a plaintiff seeking to overcome qualified

immunity must plead specific facts that both allow the court to draw the reasonable

inference that the defendant is liable for the harm [the plaintiff] has alleged and

that defeat a qualified immunity defense with equal specificity."  Backe v.

LeBlanc, 691 F.3d 645, 648 (5th Cir. 2012).

     B.     Only Defendant Smith Is Entitled to Qualified Immunity

         The Court's preliminary inquiry is whether the facts alleged, taken in

the light most favorable to Plaintiffs, show that any of the Individual Defendants

violated a constitutional right.  Terry, 609 F.3d at 761.  For the reasons that follow,

the Court concludes that the allegations in the SAC, construed in the light most

favorable to Plaintiffs and taken as true, establish that Defendants Davis and

Manley violated Kyana's rights under the Equal Protection Clause.

   1. <u>Glenn Davis</u>

   Plaintiffs allege that Defendant Davis violated Kyana's

equal-protection rights when he "admonished" her for her "ethnic" hairstyles,

because he "has not admonished similarly-coiffed white female students who come

to school with their multi-toned hair." (SAC ¶ 33.) Plaintiffs further allege that

Davis "violated Kyra's rights by allowing the discriminatory punishment meted

out to her by Defendant Manley [to] stand, and not taking action to override the

punishment[,] which was within his power." (<u>Id.</u>) Finally, Plaintiffs insist that

Defendant Davis "violated Plaintiffs' equal protection rights by not properly

addressing and reporting" allegations from Doug Giles (a ward of Lawanda

Fennell-Kinney who is not a party to this action), who wrote a statement that

someone had hung a noose by his locker. (<u>Id.</u>) When Giles reported the incident

to Davis, Davis merely told "the team as a whole to 'knock it off.'" (<u>Id.</u> ¶ 20.)

   i. <u>Alleged Failure to "Override" Kyra's Punishment</u>

   Plaintiffs' allegation that Davis did not override the allegedly

discriminatory punishment from Defendant Manley does not allege a constitutional

violation. Even assuming, <u>arguendo</u>, that Defendant Manley's punishment of Kyra

was discriminatory, Plaintiffs do not allege that Davis knew of the circumstances surrounding Kyra's punishment or that he intentionally refused to override that punishment because of racial animus.  Accordingly, this allegation, even if true, would not establish that Davis acted with discriminatory intent and thus would not establish a violation of Kyra's constitutional rights.

          ii.   Alleged Failure to Investigate and Report the Incident Involving Doug Giles

The allegations regarding Doug Giles also fail to allege a constitutional violation.  Because Giles is not a plaintiff in this case, Plaintiffs have no standing to assert his rights for him.  See Barker v. Halliburton Co., 645 F.3d 297, 300 (5th Cir. 2011) ("We have held that for a claim alleging deprivation of a constitutional right, an individual plaintiff must prove that the defendant violated his personal rights.") (citing Coon v. Ledbetter, 780 F.2d 1158, 1160–61 (5th Cir. 1986)).

However, insofar as Plaintiffs are alleging that this incident "show[s] the deliberate indifference of Defendant Davis and the Marion ISD towards the racially hostile environment perpetrated on African-American students in the District" (SAC ¶ 20), the Court addresses this argument in its discussion of Plaintiffs' claims under Title VI.

### iii.  Alleged Criticism of Kyana's "Ethnic" Hairstyles

With regard to the final allegation against Davis—that he "admonished" Kyana for her "ethnic" hair styles—Plaintiffs do plead facts that, if true, would establish a violation of the Equal Protection Clause.  Again, "[t]o state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'"  Priester, 354 F.3d at 424 (quoting Taylor, 257 F.3d at 473).  Plaintiffs allege that Davis criticized Kyana for wearing her hair in micro-braids, a hairstyle that is popular in the African-American community, referring to it as "ethnic."  (SAC ¶ 33.)  Plaintiffs further allege that Davis never criticized the hair of students of other races, even if they came to school with their hair dyed unnatural colors.  (Id.)  This—along with Davis's alleged use of the word "ethnic"—raises the inference that Davis singled out Kyana for criticism based not on her hairstyle but on her race.  Cf. Walker v. Thompson,  (5th Cir. 2000) (listing "patently offensive remarks regarding the hair of African-Americans" among the offensive remarks supporting plaintiffs' hostile-work-environment claim), overruled on other grounds by Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  In other words, Plaintiffs have alleged that Kyana received

unequal treatment—that she was criticized and embarrassed in front of her classmates—that she would not have received if she were not African-American. These allegations, if true, could support a finding that Davis violated Kyana's equal-protection rights.  See Lewis v. Woods, 848 F.2d 649, 651 (5th Cir. 1988) ("A violation of constitutional rights is never de minimis, a phrase meaning so small or trifling that the law takes no count of it."); Billings v. Madison Metro. Sch. Dist., 259 F.3d 807, 814 (7th Cir. 2001) (holding that claim of race-conscious seating of elementary school students for short duration, even if it had minimal effect, could not be dismissed as de minimis); Monterey Mech. Co. v. Wilson, 125 F.3d 702, 712 (9th Cir. 1997) ("[W]e can find no authority, and appellees have cited none, for a de minimis exception to the Equal Protection Clause.").

While Plaintiffs have pleaded facts supporting a constitutional violation, Davis would still be entitled to qualified immunity if he acted reasonably "in light of clearly established law at the time of the violation."  Terry, 609 F.3d at 761.  However, it was clearly established at the time of the alleged violation that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination.  See, e.g., Bowlby v. City of Aberdeen, Miss., 681 F.3d 215, 227 (5th Cir. 2012) ("[T]he main purpose of the Equal Protection Clause is to prevent official conduct that discriminates on the basis of race.") (citing Washington v.

Davis, 426 U.S. 229, 239 (1976)).  It was also clearly established that the Equal

Protection Clause's prohibition of racial discrimination prevents government

employees from treating similarly situated individuals differently based solely on

race.  See, e.g., Blackwell v. Laque, 274 F. App'x 363, 367–68 (5th Cir. 2008)

(denying qualified immunity to defendant who allegedly terminated

African-American employees based on race because it was clearly established that

the Equal Protection Clause prohibited racial discrimination); Mathers v. Wright,

636 F.3d 396, 402 (8th Cir. 2011) (affirming district court's denial of qualified

immunity because "it was clearly established that a school official may not treat a

student differently from her similarly situated peers when such conduct exceeds the

scope of professionally acceptable choices and stems from an improper personal

motivation").  A reasonable person would have known that it was unconstitutional

to criticize and embarrass a student with racially discriminatory intent.

Accordingly, Davis is not entitled to qualified immunity on this claim, and

Defendants' Motion to Dismiss is denied as to the claims against Davis.  See

Anderson, 483 U.S. at 638 (holding that government officials are entitled to

qualified immunity only if their actions "could reasonably have been thought

consistent with the rights they are alleged to have violated").

2.  <u>Cynthia Manley</u>

Plaintiffs allege that Defendant Cynthia Manley violated Kyra's constitutional rights when she drove away on the softball team bus without Kyra even though Kyra had shown up on time (at 2:55 p.m.) and even though Manley had seen Kyra waving at the stop sign.  (SAC ¶¶ 23, 33.)  "Defendant Manley further violated Kyra's rights," insist Plaintiffs, "by punishing her for signing out for lunch on a game day by denying her the opportunity to play for two games," as she had never punished any of Kyra's white teammates for doing so.  (<u>Id.</u> ¶ 33.) Finally, Plaintiffs insist that "Defendant Manley violated Kyra's equal protection rights by encouraging two white students to file unsubstantiated criminal charges against Kyana [after] a verbal confrontation [that Manley] did not witness."  (<u>Id.</u>)

i.  <u>Events Surrounding the Lulling Game</u>

Defendants insist that "Plaintiffs have not plead[ed] that any white student was treated differently concerning signing out at lunch and then not being allowed to play in the game or not allowed to ride on the game bus."  (Resp. at 2.) However, Plaintiffs do allege that "Defendant Manley had never before punished any of Kyra's white classmates for signing out for lunch on game day, although that had occurred on several occasions."  (SAC ¶ 33.)  Accordingly, taking Plaintiffs' allegations as true—<u>i.e.,</u> assuming that Kyra arrived at 2:55 pm for what

23

she had been told was a 3:05 pm departure; that Manley drove away without Kyra

on the bus and continued to drive even though she saw Kyra waving at the stop

sign; that Manley then told Kyra that she could not play because she had signed out

of school for lunch on a game day; and that white classmates had signed out for

lunch on a game day "on several occasions" and had not been left behind or forced

to sit out of the game—a jury could find that Manley treated Kyra differently than

her white teammates and that she did so with discriminatory intent.  Plaintiffs'

allegations imply that it was fairly common for students to sign out of school for

the lunch break and that Manley had never disciplined Kyra's teammates for doing

so.  If Plaintiffs can substantiate these allegations, a jury could find that Manley's

stated reason for disciplining Kyra—that she had signed out for lunch—was a mere

pretense.

    As explained above, a plaintiff alleges a violation of the Equal

Protection Clause when she alleges that she "received treatment different from that

received by similarly situated individuals and that the unequal treatment stemmed

from a discriminatory intent."  Priester, 354 F.3d at 424.  Plaintiffs have done so

here: They have (1) alleged that Defendant Manley deliberately left Kyra behind

and forced her to sit out of the game even though Manley had never treated Kyra's

white classmates that way when they had signed out of school for lunch; and (2)

alleged additional facts that, if proven, could support the inference that Defendant Manley acted with discriminatory intent, such as that Manley saw Kyra at the stop sign and deliberately ignored her.  Moreover, as described above, it was clearly established at the time of the alleged violation that it was unconstitutional for a teacher or coach to intentionally discriminate against a student based on her race. Because Plaintiffs' allegations, if true, would establish that Manley violated a clearly established constitutional right, Manley is not entitled to qualified immunity—and Defendants' Motion to Dismiss is denied—as to this claim.

ii. <u>Plaintiffs' Remaining Allegations Against Manley</u>

Plaintiffs' remaining allegations against Manley, however, do not establish a violation of the Equal Protection Clause.  First, Plaintiffs' own statements belie the claim that Defendant Manley's decision to make Kyra sit out the second game was driven by racial animus: Plaintiffs state that "Ms. Fennell-Kinney arrived at the softball field to take her distraught daughter home" and that "Defendant Manley threatened to officially reprimand Kyra <u>for leaving a game</u> [early]."  (<u>Id.</u> (emphasis added).)  Thus, the SAC itself suggests that Defendant Manley had a legitimate, non-race-based reason for requiring Kyra to sit out the second game: because she had left the game early after being told that she would not start.  Plaintiffs have alleged no facts to suggest that Coach Manley

never punished students of other races for leaving games early, and the Court has no reason to think that Kyra's teammates would not have been treated the same way if they had left. Accordingly, this allegation does not support a finding that Defendant Manley violated Kyra's constitutional rights.

Plaintiffs also allege that the softball team took a team photo at the Lulling game, when Kyra was not present. (SAC ¶ 23.) Plaintiffs allege that one of the team members was in a shadow in the photo, leading Kyra's teammates to joke, "Who's the black girl?" and "Oh, that's Kyra, we cropped her into the picture because she was on her lunch date and missed the photo." (Id.) Plaintiffs insist that the teammates made this comments in Coach Manley's presence, and they argue that Manley should have rebuked the students. (Id.) However, Plaintiffs do not allege that Manley heard the comments; they allege only that they were made "in her presence," suggesting she might not have heard them. More importantly, the teammates' comments, while perhaps insensitive, were a far cry from the kind of openly racist epithets (terms like the "n-word") that would demand a teacher's rebuke. Indeed, it is not clear from the girls' alleged statements that their comments reflected racial bias rather than merely teenage "cattiness." Even if Defendant Manley did hear the teammates' comments, therefore, the Plaintiffs'

allegations do not support the inference that Defendant Manley acted with discriminatory intent when she failed to reprimand the girls.

Finally, with regard to Plaintiffs' allegation that Defendant Manley told other students "to file unsubstantiated criminal charges against Kyra for a verbal confrontation [that] Coach Manley did not witness" (SAC ¶ 33), Plaintiffs have failed to plead any facts that would suggest that Manley's alleged actions were racially motivated.  Plaintiffs' assertion that "Defendant Manley used these two white girls as 'cat's paws' to further her racist attitudes towards Kyana" is an example of the "conclusory allegations" and "unwarranted factual inferences" that the Court need not accept as true.  Plotkin, 407 F.3d at 696.  Accordingly, Plaintiffs fail to state an equal-protection claim against Defendant Manley based on the allegations surrounding the second softball game and the alleged criminal charges.

3.   Ashley Smith

Plaintiffs' only allegation against Defendant Ashley Smith is that she "violated the . . . equal protection rights of Plaintiff Kyana Fennell by calling her a 'bad influence' in front of her white classmates because Kyana is a young mother in high school."  (SAC ¶ 33.)  In its January 28, 2013 Order, this Court dismissed without prejudice Plaintiffs' claims against Smith because Plaintiffs had not

alleged facts to suggest that Smith's statement was motivated by racial bias.  See Fennell v. Marion Indep. Sch. Dist., Civ. No. 5:12-CV-941, 2013 WL 321880, at *6 (W.D. Tex. Jan. 28, 2013).  Specifically, the Court noted that Plaintiffs had not alleged that other students at Marion had had children during high school but had never been called "bad influences" or otherwise criticized by Ms. Smith.   Id. Accordingly, the Court granted Plaintiffs leave to amend this claim to include allegations indicating that similarly situated students had been treated differently. Id. at *12.

Plaintiffs have failed to do so.  The SAC states that "Defendant Smith never treated any of Kyana's white classmates in such a manner and ha[s] never made comments on situations involving [other students'] private lives . . . ." (SAC ¶ 33.)  Notably absent, particularly in light of this Court's previous Order, is any allegation that Defendant Smith treated similarly situated students—that is, students of other races who had children while in high school—differently.  Thus, even assuming that Defendant Smith never commented on other students' private lives, that fact does not raise the inference that Smith's comment—rude as it may have been—was driven by racial animus.  Plaintiffs themselves allege that Smith's statement reflects "a moral judgment" (SAC ¶ 17), suggesting that Smith's comment was driven not by racial bias but by her personal belief that it is

inappropriate for high school-age girls to have children out of wedlock.  Again, while the statement Smith allegedly made was undoubtedly rude, Plaintiffs have not pleaded facts sufficient to raise a plausible inference of racially discriminatory intent.  In the absence of such allegations, Plaintiffs fail to state an equal-protection claim against Smith.  Because Plaintiffs have failed to state a claim against Defendant Smith even after amending the Complaint twice, their claims against Defendant Smith are dismissed with prejudice.

II.    Plaintiffs' § 1983 Claim Against the Marion ISD for Violation of the Equal Protection Clause

    A.    Stating a § 1983 Claim against a School District

        Plaintiffs also bring a § 1983 claim for violation of the Equal Protection Clause against the Marion ISD.  (SAC ¶¶ 34–37.)  Municipalities and other local government units, such as public school districts, are among those "persons" to whom § 1983 applies.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).  However, school districts may not be held responsible for the acts of their employees under a respondeat superior theory of liability.  Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997); see also Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001) (noting that the Supreme Court has "reject[ed] municipal liability based on respondeat superior, because the text of

section 1983 will not bear such a reading").  Instead, a plaintiff must show that <u>the school district itself</u>—not merely its employees—has violated the Constitution. <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989) (citing <u>Monell</u>, 436 U.S. at 694–95).  A plaintiff can do so by showing that (1) the school district's Board of Trustees (2) adopted an official policy (3) that was the "moving force" behind a violation of constitutional rights.  <u>See</u> <u>Piotrowski</u>, 237 F.3d at 578 ("[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom.") (quoting <u>Monell</u>, 436 U.S. at 694); <u>Rivera v. Houston Indep. Sch. Dist.</u>, 349 F.3d 244, 247–48 (5th Cir. 2003) (explaining that Texas law "unequivocally" delegates to the Board of Trustees final policymaking authority) (citing Tex. Educ. Code. § 11.151(b)).  Only by satisfying all three of these elements can a plaintiff "distinguish individual violations perpetrated by [school district] employees from those that can be fairly identified as actions of the [school district] itself."  <u>Piotrowski</u>, 237 F.3d at 578.

An "official policy" need not be written down or formally adopted. Rather, a plaintiff may state a claim against the school district by alleging "[a] persistent, widespread practice" of racial discrimination, "which, although not authorized by officially adopted and promulgated policy, is so common and well

settled as to constitute a custom that fairly represents [district] policy."  Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (emphasis added).  A "handful" of instances, however, will not rise to the level of a pervasive custom or practice. See Pineda v. City of Houston, 291 F.3d 325, 329 (5th Cir. 2002).  In addition, for a school district to be liable under § 1983 in such a situation, "[a]ctual or constructive knowledge of such custom" must be fairly attributable to the Board of Trustees.  Johnson v. Moore, 958 F.2d 92, 94 (5th Cir. 1992).  In other words, "[i]f actions of city employees are to be used to prove a custom for which the municipality is liable, those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees."  Webster, 735 F.2d at 842.

B.     Plaintiffs State a § 1983 Claim Against the Marion ISD

Plaintiffs do not identify a formal "policy statement" of race-based harassment or discrimination that was "officially adopted and promulgated" by the Marion ISD Board of Trustees ("the Board").  Instead, Plaintiffs assert that the Marion ISD is liable under § 1983 because

> it sanctioned the custom, practice, and/or policy or procedures of, inter alia, 1) allowing teachers, coaches and administrators to forego their duties and obligations to protect students from racial harassment; 2) failing to discipline those students who[] are found to have racially harassed other students; 3)

failing to adequately supervise teachers, coaches and administrators in the performance of their duties; 4) allowing teachers, coaches, [and] administrators to target African-American students through more severe punishments, threats of punishments, and censure in front of white classmates; and 5) failing to impose proper and sufficient policies and/or procedures as to the racial harassment and bullying of students in general and African-American students in particular.

(SAC ¶ 36.)  Plaintiffs insist that they "consistently" reported incidents of harassment "to Marion ISD administrators and school officials over a several-year period to such a degree that Defendant District had constructive knowledge of such incidents."  (Id.)  Additionally, Plaintiffs allege that they eventually presented the allegations in this Complaint directly to the Board of Trustees in a Level III Grievance.  (Id. ¶ 26.)

Plaintiffs have pleaded sufficient facts to survive dismissal of this claim, because—as described in more detail below—they have alleged that Marion ISD employees repeatedly subjected them to disparate treatment based on race and that the Board of Trustees was deliberately indifferent to this custom.

First, as already described, Plaintiffs have alleged that Defendants Manley and Davis, Marion ISD employees, subjected Kyra and Kyana to disparate treatment based solely on race on at least one occasion.  They have also alleged that Mr. Hernandez treated Kyra differently from her white classmates: In response to Kyra's complaints about white students' abusive Facebook posts, Mr.

Hernandez allegedly said that the posts were "irrelevant" because they were made outside the school.  However, after a confrontation between Kyra and the students who had made the Facebook posts, Mr. Hernandez allegedly warned Kyra not to post on Facebook about the white students.

Second, Plaintiffs allege that Principal Wendel knew about a text message Kyra received from a white classmate that contained an animation of KKK Klansmen swinging a noose to the music of a popular song and yet took no action against the white student.  (SAC ¶ 13.)  Instead, after Kyra "confronted"[2] the student who sent the text, Principal Wendel suspended her for three days.  (Id.) Given that the KKK is a white-supremacist hate group with a history of violence against African-Americans, and particularly in light of the fact that the text contained a noose, the alleged content of this text was extremely offensive and threatening.  See Bell v. Ingalls Shipbuilding, Inc., 207 F.3d 657, at *1 (5th Cir. 2000) (unpublished) (noting that nooses "evoke[] the image of race-motivated lynching").  If Principal Wendel did indeed know the identity of the student who sent the text, his alleged failure to act—at least in light of the allegations in the SAC—demonstrated deliberate indifference to Kyra's rights.  Moreover, viewing

---

[2] The SAC states that Kyra was suspended "for fighting."  (SAC ¶ 13.)  Construing the SAC in the Plaintiffs' favor, however, the Court assumes that this was a verbal altercation.

the allegations in the light most favorable to the Plaintiffs, Principal Wendel's decision to suspend Kyra and not the white student, if he was aware that Kyra was confronting the student about the threatening text, may have stemmed from discriminatory intent.

Plaintiffs further allege that Kyra was "subjected to racial comments and slurs" from 2008 through 2012 and that school administrators took no action after the incidents were reported.  (SAC ¶¶ 13, 16.)  They insist that "[o]n numerous occasions from 2011 to 2012," Kavin reported to the principal of the middle school—first Mr. Wendel and later Ms. Walters—that she had been called "such names as 'blackie,' 'black girl,' and 'nigger' by multiple white classmates," and that another student had told a "black" joke.  (Id. ¶ 15.)  At no time, however, did either principal discipline the offending students.  (Id.)  These words—and the word "nigger," in particular—make clear that the other students were harassing Kyra and Kavin based on their race, not merely because they did not like the girls.  See Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858 (5th Cir. 1993) (concluding that routine use of the word "nigger" was direct evidence of discrimination).  Accordingly, Plaintiffs' allegation that Principals Wendel and Walters knew of the students' racial slurs supports the inference that the principals acted with discriminatory intent when they chose not to discipline those students.

See <u>DiStiso v. Cook</u>, 691 F.3d 226, 242–43 (2d Cir. 2012) ("Defendants do not—and cannot—dispute that such conduct, particularly use of the reviled epithet 'nigger,' raises a question of severe harassment going beyond simple teasing and name-calling.").

Plaintiffs also allege that the incident involving a noose beside Kyana's car "prompted additional bullying and racial harassment," including an altercation between Kavin and a white student that included the student "spitting in Kavin's face and telling her, 'Why don't you people just move.'"  (<u>Id.</u> ¶ 20.)  "Principal Walters was called to intervene"—and was presumably apprised of what happened—but the white student was not disciplined.  (<u>Id.</u>)  Again, if another student really spat in Kavin's face, referred to Kavin and her family as "you people" (meaning, the Court assumes, "you African-Americans"), and suggested they leave Marion, the allegation that Principal Walters failed to investigate the incident or discipline the white student supports an inference of discriminatory intent.

Finally, Plaintiffs' allegations regarding the second noose incident—the one involving Doug Giles—also support an inference that employees of the Marion ISD acted with discriminatory intent when they failed to investigate or otherwise respond to claims of racial harassment.  Plaintiffs allege that Giles

"wrote a statement that someone hung a noose by his locker" and "reported the

incident to the athletic director, Glenn Davis."  (SAC ¶ 20.)  Nevertheless, Davis

did not investigate the incident.  (Id.)  Plaintiffs allege that the school eventually

reported the incident to Ms. Fennell-Kinney, suggesting that other administrators

were aware of it, but that the incident was not investigated.  (Id.)  Again, in light of

the extremely threatening nature of a noose and its racial connotation, the school's

alleged failure to investigate the incident supports an inference of racially

discriminatory intent. [3]

Taking the allegations in the SAC as true, as the Court must, Plaintiffs

have alleged more than just "isolated" incidents of racial discrimination.  See

Piotrowski, 237 F.3d at 578 ("[I]solated unconstitutional actions by municipal

employees will almost never trigger liability.").  They have alleged that Kyra was

"subjected to racial comments and slurs" for years—from 2008 through 2012—and

---

[3]      The Court held above that Plaintiffs could not bring a § 1983 claim against
Davis for a violation of Giles's rights, because he is not a plaintiff in this case.
However, the incident involving Giles is still relevant to whether the District had a
"custom" of racial discrimination and to Plaintiffs' Title VI hostile-environment
claim, for which the harassment need not be targeted specifically at Plaintiffs.  See
Waltman v. Int'l Paper Co., 875 F.2d 468, 477 (5th Cir. 1989) (holding that all
sexual graffiti in office, not just that directed at plaintiff, was relevant to plaintiff's
hostile-environment claim); Walker v. Ford Motor Co., 684 F.2d 1355, 1358–59
(11th Cir. 1982) (holding that plaintiff established hostile environment where racial
harassment made plaintiff "feel unwanted and uncomfortable in his surroundings,"
even though it was not directed at him).

that school administrators took no action even though she reported each incident; that "[o]n numerous occasions from 2011 to 2012," Kavin reported to Mr. Wendel and Ms. Walters that classmates had called her "blackie," "black girl," and "nigger," but neither principal responded; that Kavin told her teacher and Ms. Walters that another classmate had told a "black" joke, and neither employee responded; that after a classmate sent Kyra a racially threatening text, Principal Wendel, who was aware of the text, did not punish the classmate and instead punished Kyra for confronting him; that Principal Wendel took no action against a student who spat in Kavin's face and asked, "Why don't you people just move?"; that the school did not investigate Doug Giles's claim that someone had hung a noose on his locker; and that Defendants Manley and Davis, as well as Mr. Hernandez, deliberately discriminated against Kyra and Kyana based on race.

Even where a plaintiff has alleged more than mere "isolated" incidents of discrimination, however, he must still allege facts that show that "[a]ctual or constructive knowledge" of those incidents is fairly attributable to the Board of Trustees. Johnson, 958 F.2d at 94. "Actual knowledge [of discrimination] may be shown by such means as discussions at council meetings or receipt of written information." Pineda, 291 F.3d at 330 (citing Bennett, 728 F.2d at 768). "Constructive knowledge may be attributed to the governing body on the ground

that it would have known of the violations if it had properly exercised its
responsibilities, as, for example, where the violations were so persistent and
widespread that they were the subject of prolonged public discussion or of a high
degree of publicity."  Id.

      Construing the SAC in Plaintiffs' favor, Plaintiffs have alleged that
the Board had actual knowledge of Marion ISD employees' custom of race-based
disparate treatment.  Plaintiffs assert that on May 30, 2012, they "presented their
Level III grievance to the entire Marion ISD Board of Trustees."  (SAC ¶ 26.)  At
that time, Plaintiffs "each read a history of the racial discrimination" to which they
had allegedly been subjected during their time as students of the Marion ISD.  (Id.)
Essentially, Plaintiffs claim that they described to the Board the same incidents that
they allege in the SAC.  Plaintiffs further allege that they requested "several
different remedies," including additional training for teachers and administrators
concerning racial harassment, but the Board took no action.  (Id.)  If, as Plaintiffs
allege, (1) Plaintiffs described to the Board the above-described incidents, (2) the
Board had no legitimate reason to disbelieve Plaintiffs' allegations, and (3) the
Board nevertheless undertook no investigation of the teachers' actions, the Board
did have actual knowledge of the alleged custom of racial discrimination and did
exhibit deliberate indifference to that custom.  Accordingly, Plaintiffs have stated a

claim against the Marion ISD under § 1983.[4]

III.   Plaintiffs' Title VI Claims Against the Marion ISD

    A.   A School District's Liability Under Title VI

       Title VI of the Civil Rights Act of 1964 is a general prohibition against discrimination by federally funded programs.  Section 601 of Title VI, as amended, provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  42 U.S.C. § 2000d.  Public educational institutions that receive federal funds are subject to this mandate.  See 34 C.F.R. § 100.13(i) (2000) (defining "recipient" to include any public "agency, institution, or organization, or other entity . . . in any State, to whom Federal financial assistance is extended").  Courts have recognized a private right of action under

---

[4]   While Plaintiffs have stated a § 1983 claim against the Marion ISD based on an unofficial policy or custom of racial discrimination, the Court clarifies that the incidents described in this section are the only ones that clearly supported Plaintiffs' claims.  Plaintiffs' remaining allegations either involved student-on-student harassment of which no Marion ISD employee was apparently aware (such as the allegation that white classmates told Kavin that "black girls weren't pretty enough to be cheerleaders" and that she "looked like a boy" (SAC ¶ 15)) or presented non-race-based reasons for the school's actions (for example, the SAC itself indicates that the school was unable to apprehend the person who allegedly left a noose next to Kyana's car because there was insufficient evidence to work with).

Title VI if the violations alleged involve <u>intentional</u> discrimination by the funding

recipient.  <u>See</u> <u>Alexander v. Sandoval</u>, 532 U.S. 275, 280–81 (2001) (holding that

Title VI, on which Title IX is patterned, prohibits only intentional discrimination).

   In the context of Title IX, the Supreme Court has explained that

school districts "may be liable for 'subjecting' their students to discrimination

where the recipient is deliberately indifferent to <u>known</u> acts of <u>student-on-student</u>

[] harassment and the harasser is under the school's disciplinary authority." <u>Davis</u>

<u>v. Monroe Cty. Bd. of Educ.</u>, 526 U.S. 629, 646–47 (1999) (emphasis added).  To

be actionable, the harassment must be "so severe, pervasive, and objectively

offensive that it denies its victims . . . equal access to education . . . ." <u>Davis</u>, 526

U.S. at 652.  "Deliberate indifference," in turn, can be shown if a school

administrator "respond[s] to known peer harassment in a manner that is . . . clearly

unreasonable." <u>Id.</u> at 649; <u>accord</u> <u>Fitzgerald v. Barnstable Sch. Comm.</u>, 555 U.S.

246, 254–58 (2009) (explaining that a Title IX plaintiff "can establish school

district liability by showing that a <u>single</u> school administrator with authority to take

corrective action responded to harassment with deliberate indifference") (emphasis

added).

   While both <u>Davis</u> and <u>Fitzgerald</u> were Title IX (sex discrimination)

cases, the Supreme Court has repeatedly emphasized that the two statutes should

be interpreted in the same way.  See Fitzgerald., 555 U.S. at 258 ("Congress

modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX

with the explicit understanding that it would be interpreted as Title VI was.")

(citation omitted); Gebser v. Lago Vista Indep. Sch. Dist, 524 U.S. 274, 286 (1998)

(noting that Title IX and Title VI "operate in the same manner"); Cannon v. Univ.

of Chicago, 441 U.S. 677, 694–95 (1979) ("Title IX was patterned after Title VI

. . . .  Except for the substitution of the word 'sex' in Title IX to replace the words

'race, color, or national origin' in Title VI, the two statutes use identical language

to describe the benefitted class.").   Thus, while the Court is not aware of a case in

which the Fifth Circuit explicitly addressed the question, the Court agrees with

those courts of appeals that have applied Title IX's deliberate indifference standard

to claims of student-on-student racial harassment under Title VI.  See, e.g., Zeno v.

Pine Plains Cent. Sch. Dist., 702 F.3d 655 (2d Cir. 2012) ("Title VI provides a

private right of damages against a school district for student-to-student harassment

if the school district was deliberately indifferent to the known harassment.");

Bryant v. Indep. Sch. Dist. No. I–38, 334 F.3d 928, 931–34 (10th Cir. 2003)

(applying deliberate indifference standard to peer racial harassment claim under

Title VI).[5]

---

[5]     The Office of Civil Rights explains that "an alleged harasser need not be an

B.   <u>Plaintiffs Have Stated a Claim Against the Marion ISD Under Title VI</u>

Plaintiffs have stated a claim under Title VI, because they have adequately alleged that administrators of the Marion ISD were deliberately indifferent to known acts of severe and pervasive student-on-student racial harassment.  <u>See</u> <u>Davis</u>, 526 U.S. at 646–47.

 As described in detail in Part II.B., <u>supra</u>, Plaintiffs have alleged that white classmates, over a number of years, frequently subjected Kyra and Kavin to racial slurs such as "blackie," "black girl," and "nigger," and that their teachers and principals took no action—whether investigatory or disciplinary—even after the girls reported the slurs.  Depending on the frequency with which students used these epithets, this allegation alone, if proven, could support a finding of severe harassment.  <u>Compare</u> <u>Walker v. Thompson</u>, 214 F.3d 615, 619–22 (5th Cir. 2000) (holding that a hostile work environment claim survived summary judgment where evidence demonstrated years of inflammatory racial epithets, including "nigger" and "little black monkey"), <u>and</u> <u>Walker v. Ford Motor Co.</u>, 684 F.2d 1355 (11th

---

agent or employee of the recipient because this theory of liability under Title VI is premised on a recipient's <u>general duty to provide a nondiscriminatory educational environment</u>."  Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance (hereinafter "OCR Investigative Guidance"), 59 Fed. Reg. 11448-01, at 11449 (Mar. 10, 1994) (emphasis added).

Cir. 1982) (finding hostile environment where use of derogatory terms was "repeated, continuous, and prolonged"), with Gilbert v. City of Little Rock, 722 F.2d 1390 (8th Cir. 1983) (holding that hostile environment not created by isolated and allegedly unrelated racial slurs).  In DiSisto v. Cook, for example, the plaintiff alleged that his classmates had repeatedly called him "nigger" and "blackie" and suggested that his skin remained dirty even after washing.  691 F.3d at 242.  The Second Circuit, affirming the district court's denial of the defendant-teachers' qualified immunity claim, found that "such conduct, particularly use of the reviled epithet 'nigger,' raises a question of severe harassment going beyond simple teasing and name-calling."  Id. at 242–43.  "[I]n the school context," the court explained, "a teacher's indifference to children's use of this particular epithet to belittle a child may well be found to have caused the sort of educational deprivation referenced in Davis, particularly if its use was 'sufficiently continuous and concerted . . . to be deemed pervasive.'"  Id. at 243 (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)); see also Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1034 (9th Cir. 1998) ("It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore

or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts."). Accordingly, Plaintiffs' allegation that other students repeatedly used these offensive and derogatory epithets over the course of years adequately alleges that Plaintiffs were subjected to severe and pervasive harassment.

In addition to the alleged racial epithets, Plaintiffs have alleged that, on at least three occasions, the harassment they experienced involved either an animation of a noose (the text message) or an actual noose (the alleged incidents involving Kyana's car and Doug Giles's locker). It goes without saying that nooses are symbols of racial hate, reminders of a not-so-distant time when vigilantes and mobs lynched African-Americans. See Bell, 207 F.3d 657, at *1 (noting that nooses "evoke[] the image of race-motivated lynching"). Accordingly, harassment involving nooses is particularly severe and especially harmful. See Vance v. S. Bell Tel. & Tel. Co., 863 F.2d 1503, 1506–10 (11th Cir. 1989) (hostile environment created where noose was hung at employee's workstation on two occasions), abrogated on other grounds by Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993). As explained above, the allegations regarding the noose near Kyana's car do not indicate that the school acted with discriminatory intent when it failed to apprehend the perpetrator; however,

Plaintiffs have alleged that the school was deliberately indifferent to the text message (which depicted both a noose and the KKK) and the noose by Doug Giles's locker, refusing to investigate either incident or to discipline the student known to have sent the text message.

Plaintiffs also allege that a classmate spat in Kavin's face and asked, "Why don't you people just move?"  They insist that the school took no action against the student who spat on Kavin, an allegation that bolsters their claim of deliberate indifference on the part of school administrators.

Finally, as described above, Plaintiffs have alleged that Defendants Manley and Davis, as well as non-defendant Mr. Hernandez, deliberately discriminated against Kyra and Kyana based on race.  By virtue of their positions of authority, teachers who deliberately discriminate against students can have a particularly harmful effect on the school environment.  See OCR Investigative Guidance, 59 Fed. Reg. 11448-01, at 11448 ("[R]acially based conduct by a teacher, even an 'off-duty' teacher, may have a greater impact on a student than the same conduct by a school maintenance worker or another student.").  Accordingly, the allegations against Manley, Davis, and Hernandez, which assert teacher-on-student harassment, also support Plaintiffs' hostile-environment claim.

In sum, Plaintiffs have alleged many instances in which administrators of the Marion ISD were deliberately indifferent to known acts of severe student-on-student racial harassment and to at least three incidents of teacher-on-student harassment or disparate treatment.  The alleged harassment was sufficiently severe to create a hostile educational environment, one that deprived the student-Plaintiffs of benefits to which they were entitled.  See Hayut v. State Univ. of New York, 352 F.3d 733, 750 (2d Cir. 2003) (explaining that misconduct that "simply created a disparately hostile educational environment relative to [plaintiff's] peers . . . could be construed as depriving [plaintiff] of the benefits and educational opportunities available at [the school]"); OCR Investigative Guidance, 59 Fed. Reg. 11448-01, at 11449 ("If OCR determines that the harassment was sufficiently severe that it would have adversely affected the enjoyment of some aspect of the recipient's educational program by a reasonable person, of the same age and race as the victim, under similar circumstances, OCR will find that a hostile environment existed.").  Indeed, Plaintiffs have alleged that Ms. Fennell-Kinney felt she had no choice but to remove her children from the school district.  See Zeno, 702 F.3d at 667 ("Where, as here, the decision to withdraw was motivated by a racially hostile educational environment, a strong nexus between the harassment and the deprivation of educational benefits is

evident.") (citing <u>Hayut</u>, 352 F.3d at 750).  Plaintiffs have also alleged that they presented of all these incidents to the Board of Trustees and that the Board, with actual knowledge of harassment, chose neither to investigate their claims nor to discipline any of the alleged perpetrators.  Accordingly, because Plaintiffs have adequately alleged that school administrators were deliberately indifferent to known, severe, and pervasive racial harassment, this claim survives Defendants' Motion to Dismiss.

CONCLUSION

For the reasons given, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Second Motion to Dismiss for Failure to State a Claim. (Doc. # 18.)  Plaintiffs' claims against Defendant Ashley Smith are **DISMISSED WITH PREJUDICE**; Defendants' Second Motion to Dismiss is **DENIED** as to all other claims.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, August 2, 2013.


_____
David Alan Ezra
Senior United States District Judge