UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| KYANA FENNELL and LAWANDA | § | |
| FENNELL-KINNEY, as next friend of | § | |
| KYRIANNA ADAMS FENNELL and | § | |
| KAVIN JOHNSON, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | No. SA:12-CV-941-DAE |
| | § | |
| MARION INDEPENDENT SCHOOL | § | |
| DISTRICT, GLENN DAVIS, | § | |
| Individually, and CYNTHIA | § | |
| MANLEY, Individually, | § | |
| | § | |
| Defendants. | § | |

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

On June 24, 2014, the Court heard argument on Defendants' Motion

for Summary Judgment (the "Motion") (Dkt. # 37).  R. Chris Pittard, Esq.,

appeared on behalf of Plaintiffs.  Donald Wood, Esq., and Stacy Castillo, Esq.,

represented Defendants.  After careful consideration of the arguments presented at

the hearing and the supporting and opposing memoranda, the Court **GRANTS**

Defendants' Motion.

1

BACKGROUND

Plaintiffs Kyana Fennell and Lawanda Fennell-Kinney, acting as next friend of Kyrianna Fennell ("Kyra") and Kavin Johnson (collectively "Plaintiffs") filed the instant lawsuit on October 4, 2012, claiming Defendants Marion Independent School District ("Marion" or "Marion ISD"); Glenn Davis, individually and in his official capacity; Ashley Smith, individually and in her official capacity; and Cynthia Manley ("Coach Manley," or "Manley"), individually and in her official capacity, discriminated against Plaintiffs under Title VI and violated the Civil Rights Act, 42 U.S.C. § 1983.  (Dkt. # 1.)

On January 28, 2013, the Court dismissed with prejudice the claims against Glenn Davis, Cynthia Manley, and Ashley Smith in their official capacities after Defendants moved to dismiss the claims in the Amended Complaint.  (Dkt. # 13 at 2.)  The Court granted Plaintiffs leave to file a Second Amended Complaint ("SAC").  (Id.)

Plaintiffs filed the SAC on March 14, 2013.  ("SAC," Dkt. # 15.)  The SAC alleges violations of Title VI and the Civil Rights Act, 42 U.S.C. § 1983, against the same defendants, with the individuals sued only in their individual capacities.  (Id.)

In response, Defendants filed a Second Motion to Dismiss.  (Dkt. # 18.)  The Court granted that motion in part and denied it in part.  (Dkt. # 29.) The Court ordered that all claims against Ashley Smith be dismissed.  (Id.)

At present, Plaintiffs' pending claims are that (1) Marion ISD violated Title VI of the Civil Rights Act by acting in a manner that resulted in a racially hostile environment; (2) Defendant Glenn Davis, in his individual capacity, violated Kyana right to equal protection; (3) Defendant Cynthia Manley, in her individual capacity, violated Kyra's right to equal protection; and (4) that Marion ISD violated the equal protection clause.  (Dkt. ## 15, 29.)

Plaintiffs' causes of action stem from a series of events that allegedly took place while Kyra, Kyana, and Kavin were enrolled in the Marion Independent School District.  (SAC ¶¶ 11, 13.)  At the time the Complaint was filed, Kyana was 18, Kyra was 15, and Kavin was 13; each of them had attended Marion ISD from first grade until the end of the 2011–2012 school year.  (Id. ¶ 11.)  Plaintiffs state that each of them experienced the following events which precipitated their withdrawal from Marion ISD.  (Id.)

I.     Kyana Fennell

Kyana Fennell states that she experienced the following instances of harassment at Marion:

(1) While in kindergarten, she was called a "nigger" on a school bus by a white boy in her class.  (Dkt. # 41-5 18:12–19.)  Plaintiffs state that, in response, Kyana punched the boy, and the school disciplined her, but did not punish the little boy. (Id. 20:18-19, 21:2–4.)  Kyana reported that she did not have any further problems with him.  (Id.)

(2) Students in Kyana's middle school class used the word "nigger," outside of the context of their discussion of Huckleberry Finn, but not directed at Kyana.  (Id. 21:14–18.)  Kyana reported this to the teacher, who spoke with the class about it. (Id. 21:14–22:1.)  She could not remember whether the word was used more than that one time.  (Id. 29:6–10.)

(3) Kyana was "admonished by the white athletic director, Coach Glenn Davis, for her 'ethnic' hairstyles" when her hair was in microbraids.  (Id. 38:11–19.) Plaintiffs state that white students were permitted to wear their hair in non-natural colors without being admonished.  (Id.)

(4) In her sophomore year, a white male classmate called Kyana a "stupid nigger." (SAC ¶ 15; dkt. # 41-5 30:2–4.)  Kyana stated that she reported this incident to school officials, but the school did not discipline the student.  (Dkt. # 41-5 31:16– 19.)

(5) On February 6, 2012, Ms. Fennell-Kinney found a noose placed beside Kyana's car along with a note that read, "Die fuckin 'nigger sisters' . . . Bitches!!! You can

4

never bring our families down . . . Whites will always rule this town and this

school!!!! Damn spooks!!!! So go ahead and file your stupid damn complaints and

grievances . . . . . NIGGERS . . . . . and that 'Nigger lover' you have a baby

with . . . ." (Id. ¶ 19.)  The incident was reported to the Marion ISD police and the

FBI as a hate crime.  (Id.)  Ms. Fennell-Kinney testified that when she met with

Mr. Hernandez, a school administrator, he stated that although the campus police

officer, Police Officer Haverstock, was not on campus at the time, he would return

the next morning and they would begin an investigation.  (Dkt. # 41-2 62:12–19.)

Additionally, Hernandez stated he would immediately begin reviewing the campus

surveillance tape to see whether any information could be gleaned from it.  (Id.

62:18–19.)  The alleged perpetrator was never found, in part because Kyana had

the Marion police department stop its investigation of the incident.[1]  (Id. 83:5–14.)

Kyana stated that she didn't feel she could trust the police department and no

longer wanted to deal with the "backlash."  (Id.)  Kyana stated, "I was getting

depressed, I was having horrible anxiety, wasn't eating, I wasn't sleeping."  (Id.)

(6) On April 19, 2012, Kyana engaged in a verbal confrontation with two of Kyra's

teammates at an off-campus softball field.  (Id. ¶ 24.)  Plaintiffs state that

---

[1] Officer Haverstock averred that the Federal Bureau of Investigation investigated
the alleged incident, but did not reach any conclusions.  To the best of his
knowledge, the case remains open and unsolved.  (Dkt. # 37-7, Ex. K ¶ 9.)

Defendant Manley then encouraged the two white students to file criminal charges against Kyana.[2]  (Id.)

## II.    Kyra Fennell

Kyra Fennell asserts that the following events occurred:

 (1) In 2008, she received a text message from a white classmate, including an animation of the Ku Klux Klan swinging a noose.  (Dkt. # 41 ¶ 20.)  Kyra physically confronted the classmate, and it resulted in each of them being suspended for three days.  (Dkt. # 41-3 19:9–10, 19:17–22, 24:6–11, 24:14–16.)

(2)  She was subjected to racial slurs and comments during the 2011–2012 school year.  (SAC ¶ 13.)  Plaintiffs state these were reported to school officials, but no action was taken against the white students.  (Id.)

(3) During her freshman year, Kyra was left behind on the way to the Luling softball game, the district championship.  (Dkt. # 41-3 25:25–26:1.)  She states that she had been starting short-stop for the team all season.  (Id. 26:4–7.)  On the day of the Luling game, Kyra had sought and received permission from her mother to sign out before lunch that day.  (Id. 26:12–15.)  Coach Manley had, as always, provided a note to the students stating the bus would be leaving at 3:05 p.m. for the game.  (Id. 58:12–20.)  Kyra did not return to school until approximately 2:55

---

[2] In Manley's deposition, she testified that she did not encourage the students to file criminal charges, but only stated that was an option for them if they felt threatened or unsafe.  (Dkt. # 41-8 78:15–25.)

p.m., when another parent drove her back.  On the way in, Kyra states she saw the bus for the softball team leaving, and claims she tried to waive it down.  (Id. 40:20–23.)  Typically, for away games, the team would load the bus during the last period of the day, the athletics period.  (See id. 40:1–17.)  Kyra had missed athletics period, and Defendant Manley had loaded the bus and departed without her.  (Id.)  Kyra states that when she saw the bus leaving, the mother who was driving her began "waiving her hands and honking her horn."  (Id. 41:6–12.)  The bus did not stop.  The mother then drove Kyra to the softball field.

Kyra testified that she had not previously had a teammate who had missed the bus.  (Id. 47:20–22.)  Kyra stated that once she arrived at the field, she went to speak to Coach Manley.  (Id. 47:23–48:3.)  Manley told her she would not be playing because she missed her athletics period.  (Id. 48:16–17.)  However, Kyra stated that Manley later told her that she was going to get to play, but she just would not be starting.  (Id. 50:8–12.)  Prior to this, Kyra had called her mother who then showed up at the field.  (Id. 53:13–17; 56:15–25.)  Kyra's mother stated she was going to take her home, and Kyra testified that Manley told Kyra and her mother that if Kyra left the game, she would be suspended or benched the following game, which she was.  (Id.)

(4) On the day of the Luling game, a team photo was taken, without Kyra, in which one of the girls was in shadow.  (Id. 68:13–69:5.)  Plaintiffs state that one of the

white girls asked, "Who's the black girl?" and another replied, "Oh, that's Kyra, we cropped her in to [sic] the picture since she was on her lunch date and missed the photo." (Id.) Kyra stated in her deposition that these racist comments were posted on the internet, but that she did not report it to anybody at the school. (Dkt. # 41-3 68:13–69:9.)

(5) On April 17, 2012, Kyra received a text message from a white student stating that some of her white teammates had been making disparaging comments about her sister, Kyana, and her niece. (Id. 69:15–25.)

(6) Kyra was taunted by three of her white classmates over several days. (SAC ¶ 25.) Kyra reported these incidents to a counselor at the school, Mr. Hernandez, but no action was taken. (Id.) Plaintiffs state that these same girls harassed Kyra on Twitter and Facebook, referring to her as a "self-centered bitch" and a "bitch." (Id.) Plaintiffs reported these comments to Mr. Hernandez, but in response, he claimed these comments were "irrelevant" because they occurred outside of school, and Kyra states that "[h]e said that we need to stay off the Internet, that it's useless and that he couldn't do anything about it because it wasn't done at school. (Dkt. # 41-3 94:7–9.) Mr. Hernandez then "cautioned Kyra about her Facebook postings" regarding these girls. (Id.)

III.   Kavin Johnson

Kavin Johnson asserts that she experienced the following events:

8

(1) In February 2011, when Kavin was in sixth grade, a student called her "Nigger" in the hallway.  (Dkt. # 41-4 17:18–23; 83:19–20.)  Kavin testified that she had been in a fight with that student approximately a week prior—other students had surrounded Kavin and the student in question "swung at [her] first and then [they] ended up fighting."  (Id. 18:7–23, 21:5–7, 84:12–13.)  As a result, the principal at the time, Mr. Wendell, suspended each girl for three days.  (Id. 20:21–24.)  Kavin was unsure whether the student was punished for her use of the term "nigger."  (Id. 23:18–20.)  Plaintiffs contend that the principal did not investigate the incident until after the suspension, and when the principal concluded that Kavin had only been defending herself, no other action was taken against the other students.  (SAC ¶ 14.)

(2) During the 2011–2012 school year, Kavin was called, "blackie," "black girl," and "nigger" by multiple white classmates.  (Id. ¶ 15.)

(3) In seventh grade, a classmate told a "black joke," which Kavin reported to a teacher and the principal.  (Id. ¶ 15.)  The teacher responded that the student did not mean it that way.  (Dkt. # 41-4 24:6–14, 24:22–24.)  When Kavin reported this incident to the principal, he called the student's mother, but Kavin did not know if the student received any form of discipline.  (Id. 27:16–21, 28:3–5.)

(4) During the 2011–2012 school year, Kavin tried out for the cheerleading squad. (Id. 60:12–21.)  Students filmed Kavin's tryouts, and they made the video available

on the internet naming it "Little boy tries out for cheerleading." (Id.)  White
students commented that "black girls weren't pretty enough to be cheerleaders"
and that Kavin "looked like a boy." (Id.)  Although Kavin did make the squad,
Plaintiffs contend that she was excluded from cheerleader activities sponsored by
her white classmates. (Id. 98:16–25.)  Kavin's mother spoke to the cheer sponsors
about the incident. (Id. 60:1–2.)

(5) At one point, during her seventh grade year, a student spit on Kavin. (Id.
28:17–22.)  Kavin stated that she had no history with the student; she stated, "[i]t
was in the cafeteria, and I was walking with my tray, and I just felt spit hit my
face." (Id. 29:12–23.)  Kavin knew that the principal called the student to his
office, and she subsequently had no further problems with that student. (Id. 32:15–
16.)

IV.   Other Racial Harassment

        Plaintiffs also state that the racial harassment was not limited to
Kyana, Kyra, and Kavin. (SAC ¶ 20.)  According to Plaintiffs, "Doug Giles, a
ward of Lawanda Fennell-Kinney was called 'Nigger' by his white classmates at
the high school and [on] January 6, 2012, he wrote a statement that someone hung
a noose by his locker." (Id. ¶ 20.)  Plaintiffs state that this incident was reported to
the athletic director, Defendant Davis, whose only response was to speak to the
athletic team. (Id.)

V.   <u>Plaintiffs' Response</u>

While Kyana, Kyra, and Kavin were at Marion ISD,  Plaintiffs filed a

number of grievances.[3]  (Dkt. # 37-5 31:1–32:20.)  After Plaintiffs filed a Level III

grievance and asked for certain remedies that the District refused to issue Plaintiffs

removed Kyana, Kyra, and Kavin from Marion ISD.  (<u>Id.</u> ¶ 26.)  According to the

SAC, "Ms. Fennell-Kinney cited several violations of District Policy including its

'zero tolerance' of harassment policy.  Ms. Fennell-Kinney requested several

different remedies including updating the District policy to address the situation

presented by the Plaintiffs [and] additional training for teachers and administrators

concerning racially-hostile environments and harassment."  (<u>Id.</u>)

LEGAL STANDARD

A court must grant summary judgment when the evidence

demonstrates "that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

Court evaluates the proffered evidence in the light most favorable to the

non-moving party.  <u>Lemelle v. Universal Mfg. Corp.</u>, 18 F.3d 1268, 1272 (5th Cir.

1994).  A Court "examines the pleadings, affidavits, and other evidence introduced

in the motion, resolves any factual doubts in favor of the non-movant, and

---

[3] Marion has a three-level grievance procedure with an option to appeal a
grievance decision to a higher level.  (Dkt. # 41-8 at 70–74.)

determines whether a triable issue of fact exists." <u>Leghart v. Hauk</u>, 25 F. Supp. 2d 748, 751 (W.D. Tex. 1998).

In seeking summary judgment, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden then shifts to the non-moving party "to go beyond the pleadings and by [his or her] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 324 (internal quotation marks omitted). The non-moving party "must, either by opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing a genuine issue as to a material fact exists." <u>Leghart</u>, 25 F. Supp. 2d at 751. "[Non-movants] are required to identify the specific evidence in the record and to articulate the precise manner in which that evidence supports their claim." <u>Id.</u> Further, "Rule 56 does not require the district court to sift through the record in search of evidence to support a [non-movant's] opposition to summary judgment." <u>Id.</u>

If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the Court must grant summary judgment against that party. <u>Celotex</u>, 477 U.S. at 322.

12

<u>DISCUSSION</u>

I.    <u>42 U.S.C. § 1983 Claims</u>

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 is not, itself, a source of substantive rights;

however, it provides a vehicle by which a plaintiff can enforce federal rights

conferred elsewhere.  <u>Albright v. Oliver</u>, 510 U.S. 266, 271 (1994).

Plaintiffs bring claims pursuant to § 1983 violations of their right to

equal protection of the laws.  "To prove a prima facie case of discrimination under

the equal protection clause, a plaintiff must show (1) that he is a member of a

protected class, (2) that he is otherwise similarly situated to members of the

unprotected class, and (3) that he was treated differently from members of the

unprotected class."  <u>Jackson v. Katy Indep. Sch. Dist.</u>, 951 F. Supp. 1293, 1302

(S.D. Tex. 1996) (citing <u>McNabola v. Chicago Transit Auth.</u>, 10 F.3d 501, 513 (7th

Cir. 1993)).  A plaintiff must also demonstrate "that Defendants acted with

discriminatory intent."  <u>Id.</u>; <u>Gomiller v. Dees</u>, No. 4:06CV33-D-B, 2007 WL

1031359, at *3 (N.D. Miss. Mar. 29, 2007) ("To state a claim for racial

discrimination under the Equal Protection clause, the plaintiff 'must allege and prove that he received treatment different from that received by similarly [situated] individuals and that the unequal treatment stemmed from a discriminatory intent.'" Id. at *5 (quoting Priester v. Lowndes Cnty., 354 F.3d 414, 424 (5th Cir. 2004))). "To state a claim under the Equal Protection Clause, a § 1983 Plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." Williams v. Bramer, 180 F.3d 699, 701, 705 (5th Cir. 1999) (finding that while an officer's use of a "racial epithet is compelling evidence of racial animus, . . . the plaintiff must still show that the officer engaged in specific conduct that denied [the plaintiff] equal protection of the laws."). Or, stated another way, "[t]o state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff must allege and prove that [she] received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." Priester, 354 F.3d at 424 (internal quotation marks omitted).

   In the Fifth Circuit, "[a] discriminatory purpose implies that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." Priester, 354 F.3d at 424 (internal citations and quotation marks omitted).

A.     Claims Against Glenn Davis

Plaintiffs claim that Davis violated Kyana's right to equal protection under the laws and is liable under § 1983 because of (1) his alleged admonishments to Kyana regarding her "ethnic" hairstyle (SAC ¶ 33) and because he "conducted a biased investigation into the April 19, 2012 incident . . . where he found that [Kyana] had bullied two white classmates."  (Dkt. # 41 at 9.)

1.     Comments Regarding Kyana's Hair

First, the summary judgment evidence presents an issue of fact as to what Coach Davis said to Kyana regarding her hair.  Kyana states that she remembers Davis stating "I know how much you people spend on your ethnic hair styles."  (Dkt. # 37-2 38:20–23.)  In contrast, Davis denies this and stated he made no reference to her hair style being ethnic.  (Dkt. # 37-6 48:12–17.)  According to Davis, he commented on Kyana's hairstyle because it was dyed an unnatural color, in violation of the school's athletic policy.  (Id. 47:12–48:24.)  Similarly, Davis testified that this policy was applied to students involved in the athletic program during the year, regardless of race.  (See id. 58:12–59:16.)  Although initially, Plaintiffs alleged that Davis referenced Kyana's hair because it was styled in microbraids (SAC ¶ 16), neither party disputes that the picture attached in Exhibit A-1 to Defendant's Motion for Summary Judgment (Dkt. # 37-2 at 71) is an accurate representation of Kyana's hairstyle when Davis' comments allegedly

15

occurred. (Dkt. # 37-2 41:6–12.) Therefore, the photograph demonstrates that Kyana's hair was not in microbraids at the time, but merely dyed an unnatural color, in violation of the athletic policy. Therefore, even if Kyana's statement were true, it does not establish that Davis treated Kyana differently than her peers, even if he used the term "ethnic" because Davis also stated that any student, regardless of race, would not be permitted to maintain their hair an unnatural color. (See id. 58:12–59:16.)

In Williams, the Fifth Circuit explicitly stated that "an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation." 180 F.3d at 706. The court concluded, stating that because the officer "made only one, isolated comment and he in no other way impinged on [the plaintiff's] rights[,] [w]e cannot conclude that [the officer's] alleged conduct . . . rises to the level of harassment." Id.

Therefore, as in Williams, Plaintiffs cannot establish an equal protection violation against Davis, and the Court **GRANTS** summary judgment on this claim.

### 2. Davis's Investigation

Plaintiffs also contend that Defendant Davis conducted a biased investigation into the incident in which two white students ultimately filed criminal charges against Kyana. (Dkt. # 41 at 9.) Davis wrote an incident report based on

16

information from Defendant Manley.  (Id.)  Plaintiffs argue that because he did not interview Kyana, it demonstrates that he acted based on racial bias against her. However, in his deposition, Davis testified he could not recall speaking with any of the students involved.  (Dkt. # 41-10 77:10–18.)  Based on Davis' testimony, and Plaintiffs' lack of evidence to the contrary,[4] it appears Davis treated Kyana in exactly the same way he treated the white students:  Davis did not speak to any of them.  And while the Court may not agree that this is the best way to investigate an incident, there is no material issue of fact as to whether Kyana was treated differently because of her race.  Therefore, the Court **GRANTS** summary judgment to Defendants on this claim.

B.    Claims Against Cynthia Manley

Plaintiffs claim that Manley violated Kyra's and Kyana's rights to equal protection and is liable under § 1983 because (1) Manley left Kyra behind on the way to the Luling softball game; (2) Manley punished Kyra for signing out for lunch on a game day by refusing to let her play for two softball games when she had never done the same to a white student (Dkt. # 41-1 ¶¶10–11); and (3) Manley

---

[4] Plaintiffs have presented only their belief and conjecture as to what happened. However, suppositions are not enough to create a genuine issue of material fact. Lechuga v. S. Pac. Transp. Co., 949 F.2d 790, 798 (5th Cir. 1992) (holding that "testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment").

encouraged two white students to file charges against Kyana for the verbal
confrontation that Manley did not witness.  (SAC ¶ 33.)

> 1.    The Luling Game and Consequences for Kyra

The Court finds that Coach Manley acted in accordance with the
published athletic policy and with her unwritten policy of which students were
aware.  The Court finds that although there may be an issue of fact as to whether
Coach Manley saw Kyra as the bus was leaving, it is not material.  The totality of
the evidence clearly demonstrates that Coach Manley did not act in a manner based
on racial bias during these events.

First, there is no dispute that Kyra had been starting on the softball
team all season.  Second, Manley always took roll call during athletics period; she
stated that "if [a student was] absent at roll call, that means they [were] absent
from class.  They're not in class, so there's no reason to wait for them.  They're not
coming.  They're absent.  So we leave." (Dkt. # 37-6 42:21–43:4.)  Additionally,
she testified that if any player missed the bus, that player would be penalized by
not getting to start in that game.  (Id. 45:1–4.)  Manley testified that when other
students had missed the bus, including a starting catcher, Manley refused to let
those players start.  (Id. 45:19–22.)

Manley admits that the bus left early the day Kyra was absent.  (Id.
48:20–22.)  However, the evidence demonstrates that this was in accord with

Manley's usual practice, and Plaintiffs have put forth no evidence, other than their conjecture, that there was any racial motivation behind Manley's actions. Therefore, the Court **GRANTS** summary judgment to Defendants on this claim.

### 2.    The Criminal Charges Against Kyana

The Court finds that there is not sufficient evidence in the record to support the claim that Coach Manley acted in a manner violating Kyana's right to equal protection when she advised the two white students to file charges against Kyana.  Further, there is not sufficient evidence in the record to find that her action was based on racial bias.  Additionally, the Court has already found that Plaintiffs failed "to state an equal protection claim against Defendant Manley based on the allegations surrounding the second softball game and the alleged criminal charges."  (Dkt. # 29 at 27.)  No additional facts have been produced to change the Court's opinion.

### C.    Claims Against Marion ISD

Plaintiffs allege that Marion ISD is liable under § 1983 first because it sanctioned the custom, practice, policy, or procedures of  "(1) allowing teachers, coaches and administrators to forego their duties and obligations to protect students from racial harassment; (2) failing to discipline those students whom are found to have racially harassed other students; (3) failing to adequately supervise teachers, coaches and administrators in the performance of their duties; (4) allowing

teachers, coaches [and] administrators to target African-American students through more severe punishments, threats of punishments, and censure in front of white classmates; and (5) failing to impose proper and sufficient policies and/or procedures as to the racial harassment and bullying of students in general and African- American students in particular." (SAC ¶ 35.)

Second, Plaintiffs argue that Marion ISD is also liable under § 1983 for failing to train and/or supervise its employees and/or acquiescing to its employees' unconstitutional behavior. (Id. ¶ 34.)

### 1. Custom or Policy

In order to hold a school district liable under § 1983, a plaintiff must show that (1) an official policymaker (2) adopted an official policy (3) that was the "moving force" behind the violation of constitutional rights. Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001). In Texas, the official policymaker is the school's Board of Directors. Meyers v. LA Porte Indep. Sch. Dist., No. Civ. A. H–05–1087, 2007 WL 7119878, at *2 (S.D. Tex. Apr. 25, 2007). Ms. Fennell-Kinney brought Level III grievances against Defendant Manley, Defendant Davis, and former Defendant Ashley Smith. (Dkt. # 41-1 33:14–34:17.) The Court must determine whether the evidence demonstrates a genuine issue of material fact as to whether there was an official policy of discrimination adopted by the Board.

As a preliminary matter, the Court notes that Marion ISD is subject to the official written policies entitled (1) Student Welfare Freedom from Discrimination, Harassment, and Retaliation and (2) Student Welfare Freedom from Bullying.  (Dkt. # 37-8 at 7-32.)  These policies prohibit bullying and discrimination and harassment based on race.  (Id.)

Plaintiffs claim that despite this, Marion has an unofficial policy of permitting harassment and promoting disparate treatment of its students based on race.  The Court notes that the numerous times which Kyra, Kyana, and Kavin have allegedly endured being called "Nigger" support Plaintiffs' argument. Additionally, Plaintiffs contend that the Board's unofficial policy is evident from its failure to provide additional training for its teachers after the Level III grievance was brought to its attention.  (Dkt. # 41 at 8.)

However, the Board's response must be taken in the context of Marion's response to the combined Level I and II grievance filed by Plaintiffs and the measures Marion had already implemented.  (Dkt. # 41-8 at 32.)  In response to Plaintiffs' demands, Marion ISD responded through its superintendent Mario Sotello, as follows:

1.    Request that there not be a Level I grievance hearing with the Athletic Director, but instead be heard by me at Level II.

**Granted.  As you are aware, I agreed to hear your grievance directly as a combined Level I and Level II grievance.**

21

2)      Want a formal apology written to your daughter, Kayana [sic], from the administrative team for failing to adhere to confidentiality, for not maintaining a non-biased opinion in front of our child, for not allowing our child to feel safe in the school environment and causing undue stress and emotional harm to the point that she does not even feel comfortable participating in the sport she loves.

**Denied.  While I understand your frustration and concerns you have for your children, in my investigation of all the issues you raised in your complaint, nothing that was done by any employees of the District was to a level that I believe warrants a written apology.  I believe that all District employees took appropriate action in response to the various issues you raised to them and that you recount in your written grievance.  I believe that the District has responded aggressively and appropriately to deal with the racially motivated comments and actions that you recount being done by other students or even persons outside of the District.  I further note that since submission of your grievance, your daughter has returned to participating on the girls' basketball team.  I believe that the Athletic Director and all the other coaches have responded to all the racially motivated issues you raised with appropriate responses.  I believe they have taken steps to educate the students specifically at issue, and the Marion student body as a whole, as to racial diversity and respect.  I believe that District personnel have kept your daughter's student information confidential, but that as District employees, there are times that student information is shared between District employees who have an educational need to know of the information.  We will continue to respond to any and all inappropriate actions by students which violate the Marion ISD Student Code of Conduct.**

3.  Want a policy that covers incidents that involve district employees or their families while at auxiliary school related functions.

**Granted in part and Denied in part.  Marion ISD already has policies in place as well as an employee handbook that apply to District employees who are at District functions or events . . . .We will review those policies and the handbook with administrations to make sure we do apply those provisions when appropriate.  As**

**to your request that we have some control over family members of District employees, we do not have such authority. . . .**

4.  Want something permanently placed reflecting the incident in the teacher/coaches [sic] employee file.

**Granted.  In review of the situation, Coach Smith acted contrary to the expectations of the District and we have handled that matter as a personnel matter with Ms. Smith.**

5.  Want something in writing stating how future incidents from this particular coach will be handled to prevent other students from feeling the embarrassment and humiliation that has been caused.

**Denied.  The District does not have polices or procedures specifically tailored to individual employees as we have policies and procedures which apply to all employees. . . . In light of these allegations, we will review those policies with our employees in future staff meetings as well.**

6.  Want assurances that in the future, when issues like this arise, parents will be fully notified as course of actions are occurring and not as hindsight.

**Granted.  I agree that it would have been better to notify you that Coach Smith was returning to her assistant coaching duties following the game and after we had a chance as a District to review the entire situation. . . .**

7.  Want assurances that there will be no further retaliation against any of the children who live with the family.

**Granted.  Marion ISD, as provided in District Policies FB and FFH, does not and will not tolerate any discrimination against a student of the District based on the student's race, nor will the District tolerate any form of retaliation for filing this grievance pursuant to these same policies.  Should you feel that your students are subject to future harassment based on their race, you should report that pursuant to these policies.**

8.  Although there is an item 8, there is no remedy sought under it.

In addition to these first remedies sought, you [Plaintiffs] provided a second list of remedies sought during the grievance conference.  The following is my response to these additional remedies sought.

1.  Entire Marion ISD Staff to receive training on culture sensitivity.

**Granted.  The District annually provides training to District staff regarding illegal discrimination and general training on sensitivity towards all students and follow [sic] staff members alike.  Unfortunately situations arise where we all need a reminder of these lessons and we will revisit these issues in future staff meetings.**

2.  A school mentor available, to provide consistency, that my children can go to when they have a problem, without calling us, as parents, at work.

**Granted.  The District has counselors and your children, as are all children, are invited to speak with them about any problems they are encountering.  As your students are on different campuses, they would have different counselors differently [sic] as well.  If you wish to have a specific counselor set up for your students to go to, we can do that.  If you wish to have someone else serve as this 'mentor' for your students, the District is ready to discuss such a situation with you to come to a mutually agreeable solution.**

3.  Formal apologies from the Marion faculty involved in each of the above mentioned incidents which have not been rectified to all of the above named children involved for their inappropriate, unethical and humiliating comments.

**Denied.  As I have already stated, nothing in my investigation has shown that any District employee has acted in such a manner that an apology needs to be directed from a supervisor to them. Additionally, you have raised issues from years past which while not only are they untimely, but there is simply no way that I can look into those issues at this point in time.  While I am denying**

24

this remedy, please recognize that I do hear your frustrations and we will endeavor as a District to try and achieve better results with your concerns in the future.

4.  Disciplinary action against Coach Ashley Smith and Athletic Director, Glenn Davis should be taken as deemed appropriate by the District.

**Granted in part and Denied in part.  As previously stated in this response, I have reviewed this incident and have determined that Coach Davis did not act inappropriately in any of the situations including [sic] in your grievance.  As you are aware, Coach Smith was removed from coaching a game and we as a District have provided appropriate disciplinary actions regarding her conduct.**

5.  A verbal group apology by all the Coaching staff to all students in the athletics department for issues perceived as unprofessional behavior and the language of the athletic staff.

**Denied.  This remedy is vastly beyond the scope of anything even included in your grievance as you seek an apology from persons who may have never even had an interaction with any of your students.  Additionally, I am denying this remedy due to the fact that I do not believe an apology is warranted based on the circumstances of the complaints.**

6.  The District have an annual assembly with students of 'at least' the middle school and high school grade level on their respective campuses to educate on diversity, bullying and hate crimes.

**Granted in part.  The District provides student instruction each year over these topics and has done so this year on Tuesday, October 11, 2011 and Thursday, October 13, 2011.  Guadalupe County Probation Officer Kelley Tomlin was at our Middle School campus to provide a Bullying Program to our students. The students were divided into small groups and ran four 90 minute sessions each day to allow for a presentation format as well as a question and answer session.**

**On February 28, 2012, a presentation is slated by Motivational Productions. Scheduled presentations included the following: 9:30 a.m.—Fearless, for Middle School; and 10:45—Taking Control for the High School.**

7. The District will implement policy into place to give clear direction to immediately deal with issues of racial slurs and hate crimes and assure they are immediately brought to the attention of the principal.

**Granted in part. District Policies FB and FFH both relate to how the District will respond to discriminatory actions by students or others. There are reporting mechanisms in place in the policies that the District utilizes.**

8. Accurate notation of all of the above noted incidents should be placed in the employee files of the faculty members involved as deemed to be appropriate by the District.

**Granted. We have reviewed the various issues raised by your complaint and where disciplinary action was appropriate, that action was taken.**

9. The District reevaluate the structure of the chain of command where the Athletic Department is concerned and implement all the Athletic Department staff be under the direction of the campus Principal.

**Granted in part and Denied in part. All coaches report to both the campus principal on which they teach and report to the Athletic Director for athletics. Both supervisors have the responsibility to handle any employment issues which arise. If an issue needs to be reviewed beyond that level, both the campus administrators and the Athletic Director report to the Superintendent's office. This structure is appropriate and I do not believe it needs to be changed as it would not cause any 'swifter or more precise' actions.**

10.  The District will explore options to enhance current surveillance systems if funding is not available for new systems to ensure student safety while on campus and in the parking areas.

**Granted.  The District always reviews student safety issues and concerns and will continue to do so.  Providing additional cameras will be one possible option that I will include in the District files to consider during the next budget cycle and safety audit and review.**

11.  Reflection and consideration of diversity in the Marion ISD handbook and Athletic Policy in reference to hair color and style for minority groups, so their cultural sensitivity is also included with the policy.

**Granted.  The District reviews its policies and handbooks every summer before the start of the next year.  Included in the yearly review is the student handbook and the district's dress code requirements.  If you wish to share your views with the Board more directly, you should be sure to attend the board meetings during the summer when the board adopts these rules and share your thoughts at that time as well.**

12.  A policy put into place in reference to employees and their family's behavior while at all auxiliary school functions where the ISD faculty and students are representing Marion ISD.

**Granted in part and Denied in part.  As stated above, the District's policies and employee handbook already apply to auxiliary school functions and when employees are working for the District.  Our policies, however, cannot control family members of District employees.**

13.  Marion ISD to hire African American teachers, counsel, and support staff.

**Granted.  Marion ISD, in compliance with both federal and state laws, is an equal opportunity employer and as such does not consider the race of any job applicant when determining if the applicant is the best qualified candidate for the job.  If an African**

27

**American applies for and is the most qualified candidate for any job within the District, they will be hired.**

14.  No reprisal action be taken or retaliation be taken against any of my children in the Marion ISD.

**Granted.  Marion ISD, as provided in District Policies FB and FFH does not and will not tolerate any discrimination against a student of the district based on the student's race, nor will the District tolerate any form or retaliation for filing this grievance pursuant to these same policies.  Should you feel that your students are subject to future harassment based on their race, you should report that pursuant to these policies.**

(Dkt. # 41-8 at 32–37.)

Additionally, in his deposition Sotelo stated that aside from the yearly sensitivity training Marion ISD staff received, after the Kinney's request for additional sensitivity training, Marion brought in the DOJ to implement more training.  (Dkt. # 41-7 66:24–67:3.)

The fact that the issues of racial harassment continued does not prove that the Board had a custom or policy of permitting harassment or promoting discrimination.  It is clear from the response to Plaintiffs' grievance that Marion was actively attempting to remedy the problems at the school.  The fact that the Board declined to implement additional measures does not imply that they had a custom or policy of promoting harassment.  The alleged incidents here involved various children; Marion responded to each incident and took steps to prevent future occurrences.  These actions demonstrate that Marion did not, in fact, have a

custom or policy of promoting racial discrimination or harassment.  Therefore, the

Court **GRANTS** Defendants' Motion on this claim.

        2.      <u>Failure to Train or Supervise Marion Teachers</u>

        "Failing to adequately supervise, monitor, or train teachers 'can

ordinarily be considered deliberate indifference only where the failure has caused a

pattern of violations.'"  <u>Thomas v. Bd. of Educ. of Brandywine Sch. Dist.</u>, 759 F.

Supp. 2d 477, 492 (D. Del. 2010) (quoting <u>Berg v. Cnty. of Allegheny</u>, 219 F.3d

261, 276 (3d Cir. 2000)).  Generally, "an isolated incident, however unfortunate,

does not demonstrate evidence of . . .[a] persistent and widespread policy and will

not be considered so pervasive as to be a custom or practice." <u>Doe v. Sch. Bd. of</u>

<u>Broward Cnty.</u>, 604 F.3d 1248, 1263–64 (11th Cir. 2010); <u>see also</u> <u>Christopher v.</u>

<u>Nestlerode</u>, 240 F. App'x 481, 489–90 (3d Cir. 2007) (noting that a single

constitutional violation may provide basis for municipal liability, but only where

need for more training or supervision is "so obvious and the inadequacy so likely

to result in the violation of constitutional rights" does the the municipality's

inaction amounts to deliberate indifference).

        In <u>Jackson v. Katy Independent School District</u>, 951 F. Supp. 1293,

1296 (S.D. Tex. 1996), the plaintiffs alleged that their bi-racial son was frequently

disciplined more severely that his white peers.  The Southern District stated that

"[t]he Court cannot and should not become an arbiter of classroom disciplinary disputes absent clear proof of intentional discrimination . . . ." Id. at 1295.

Here, Plaintiffs allege that Marion's response to the racial harassment Kyra, Kyana, and Kavin endured amounted to a failure to train or supervise its staff, or both.  However, the Court finds that Marion took reasonable steps to remedy the harassment endured by Kyra, Kyana, and Kavin.

When Kyana was called a "nigger" by a fellow kindergartener, she retaliated by hitting him.  Kyana was disciplined, but the other white student was not.  The Court has previously held that a teacher may reasonably choose to discipline a child of that age for hitting, but not for using a racial epithet likely beyond that child's capacity to understand.[5]  (Dkt. # 13 at 22–23.)  Because the teacher's decisions were within an acceptable range of appropriate responses, this incident does not support a theory that Marion failed to train or supervise its teachers.

When Kyana reported that students in her class had been using the word "nigger" in her presence, but not directed at her, after reading Huckleberry Finn, the teacher spoke to the class about it.  (Dkt. # 37-2 21:9–22:9.)  Kyana

---

[5] As discussed earlier, by this statement, the Court does not mean to suggest a kindergarten teacher should tolerate or ignore a student using a racial epithet. However, the Court recognizes that there is a significant difference between a five year old, who may not fully understand the impact of what they are saying, and an older student.  In the latter case, punishment may well be called for, while in the former case, less drastic measures may be appropriate.

stated that students did not use the word in class again.  (Id. 29:1–10.)  Given that

the incident was not repeated, it appears that the teacher's methods were adequate,

and this incident does not support failure-to-train liability.

            In tenth grade, a classmate called Kyana a "stupid nigger."  (Dkt.

# 37-2 29:21–25.)  Kyana reported the incident, and the school called the

classmate's mother.  (Id.  31:23–25.)  Kyana stated that the student did not call her

that again.  (Id. 33:3–6.)  Again, it appears the teacher's actions were sufficient to

stop that harassment, and this incident does not support failure to train liability.

            When Kavin was in seventh grade, another student called her

"nigger."  (Dkt. # 37-4 16:11–19.)  The incident resulted in a fistfight, and both

Kavin and the other student were suspended for three days.  Because both students

received the same punishment, there can be no argument of disparate treatment.

            That same year, a student spit in Kavin's face.  (Dkt. # 37-4 28:17–24,

29:14–18.)  The principal called the student to his office, and Kavin did not

subsequently have any problems with the student.  (Id. 33:7–9.)  Because the

responsive action taken by Marion ended the problem with the student, the Court

finds that Marion's response to this incident does not support liability under a

failure to train theory.

            Additionally, Plaintiffs allege that Defendant Davis made comments

regarding the "ethnic" style in which Kyana wore her hair.  (Dkt. # 37-2 38:20–

25.)  However, as discussed above, Defendant Davis denies making these

statements and was instead commenting on the fact that Kyana's unnaturally-

colored hair was in violation of the Athletic Policy.  Additionally, this was a

discrete incident; there is no evidence in the record that he ever repeated these

alleged comments or discriminated against Kyana based on her race.

In each of these instances, Marion ISD's response was sufficient to

address the problem with the individual student engaging in harassment.

Additionally, although in some of these instances, Plaintiffs were themselves

disciplined, this arose from the fact that the verbal confrontations escalated into

physical confrontations.  The evidence shows that Marion's, and the individual

teachers', responses were not motivated by racial bias or a discriminatory intent,

and therefore, Plaintiffs have not raised a genuine issue of material fact as to

whether Marion failed to properly train or supervise its teachers.  The Court

**GRANTS** Defendants' Motion on this claim.

II.    Title VI Claims

In addition to their § 1983 claims, Plaintiffs also allege that Marion

ISD violated Title VI by "failing to address the issue of racial harassment and

hostile environment" that was present in the school.  (SAC ¶ 29.)

Title VI provides:

No person in the United States shall, on the ground of race, color, or
national origin, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any program or
activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

Title VI only provides a private cause of action for individuals to
enforce the provisions of section 601 which prohibits intentional discrimination
based on race, color, or national origin.  Alexander v. Sandoval, 532 U.S. 275, 276,
280–81 (2001).  Therefore, discrimination must be intentional to be actionable
under Title VI.  In the context of a hostile environment claim, the environment
must have been intentionally created or that it is the result of deliberate
indifference.  Bryant v. Indep. Sch. Dist. No. I-38 of Gavin Cnty, OK, 334 F.3d
928, 931 (10th Cir. 2003).

In order to prevail on a claim that a school district violated Title VI, a
plaintiff must show that a racially hostile environment exists, that the school
district had either constructive or actual notice of the problem, and that it did not
take adequate steps to "redress the racially hostile environment."  59 Fed. Reg. at
11449.  "[U]nder Title VI, '[i]ntentional discrimination can [be] inferred by the
defendant's deliberate indifference to differential treatment.'"  Watson ex rel.
Watson v. Jones Cnty. Sch. Dist. ex rel. Jones Cnty. Sch. Bd. of Educ., No.
2:07cv100-KS-MTP, 2008 WL 4279602, at *11 (S.D. Miss. Sept. 11, 2008).
Additionally, "deliberate indifference to known acts of [student-on-student]

harassment" can constitute intentional discrimination and violate Title VI. <u>Bryant</u>, 334 F.3d at 934.

First, a racially hostile environment is one in which racial harassment is so "severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by the recipient." <u>Watson</u>, 2008 WL 4279602, at *11 (quoting the Department of Education's <u>Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance</u>, 59 Fed. Reg. 11449 (March 10, 1994)) ; <u>see also</u> <u>Monteiro v. Tempe Union High Sch. Dist.</u>, 158 F.3d 1022, 1033 (9th Cir. 1998) (same)[6]. Further, in order to establish a hostile environment, racial harassment must rise to the level that it would "interfere with the educational program of a reasonable person of the same age and race as the victim. <u>Monteiro</u>, 158 F.3d at 1033; <u>see also</u> <u>Hayut v. State Univ. of N.Y.</u>, 352 F.3d 733, 750 (2d Cir. 2003). Additionally, the Department of Education clarified that in considering whether a hostile environment exists, attacks directed at others, besides the complainant, should be considered as well. 59 Fed. Reg. 11449–50.

---

[6] "The Department of Education is the agency charged by Congress with enforcing Title VI. As such, its interpretation is entitled to a high degree of deference by the courts so long as it does not conflict with a clearly expressed congressional intent and it is reasonable. <u>Monteiro</u>, 158 F.3d at 1033 (citing <u>Chevron v. Natural Res. Defense Council</u>, 467 U.S. 837, 844–45 (1984)).

To establish a racially hostile environment, a plaintiff must show that the environment undermined and detracted from his or her educational experience and the plaintiff was "effectively denied equal access to an institution's resources and opportunities." <u>Davis v. Monroe Cnty. Bd. of Educ.</u>, 526 U.S. 629, 651 (1999). The harassment must further have a "concrete, negative effect" on the victim's education, which may include dropping grades, becoming homebound or hospitalized due to harassment, physical violence, or physical exclusion from a school resource. <u>C.S. v. Couch</u>, 843 F. Supp. 2d 894, 907 (N.D. Ind. 2011). In the school context, the Court must also remain cognizant of the fact that some degree of teasing or name calling is unavoidable. <u>Id.</u> at 652.

Second, either constructive notice or actual notice of a racially hostile environment is sufficient to satisfy the second element of the claim. <u>Id.</u> 11450–51. "Actual notice may occur . . . when a student or parent makes a complaint about racially demeaning incidents to the appropriate educational authorities." <u>Monteiro</u>, 158 F.3d at 1034.

Third, a plaintiff must show that a school's response to the problem was inadequate. The Department of Education states that once a school district is on notice, it "has a legal duty to take reasonable steps to eliminate" the racially hostile environment. 59 Fed. Reg. 11450. If a school instead acts with deliberate indifference to the problem, it will be liable under Title VI. <u>Monteiro</u>, 158 F.3d at

1034.  This standard maintains that a school district "is liable for its failure to act if the need for intervention was so obvious, or if inaction was so likely to result in discrimination, that 'it can be said to have been deliberately indifferent to the need.'"  Monteiro, 158 F.3d at 1034 (quoting City of Canton, Ohio v.  Harris, 489 U.S. 378, 390 (1989)); Watson, 2008 WL 4279602, at *11.

        1.    Racially Hostile Environment

In Monteiro, the plaintiffs alleged that "her daughter and others were subjected to a hostile racial educational environment because they were repeatedly called 'nigger' and other racial slurs by white students."  Monteiro, 158 F.3d at 1032.  The plaintiffs also stated that these phrases were "scrawled about the school in the form of graffiti" and that she and others had complained to the school district authorities, but no action had been taken.  Id.  The court concluded that, "[i]t does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts."  Id. at 1034.

In Watson, the plaintiff, an African-American student was involved in an altercation.  2008 WL 4279602, at *1.  The plaintiff argued that the school's

response was "due to intentional racial discrimination and indicative of the [d]efendants' systemic discrimination against black students." Id. The court found that the school district was not deliberately indifferent to a racially hostile environment because when it was twice reported to the school that a white student had used racial epithets, the school suspended the student both times. Id. at * 11. The court recognized that the plaintiffs had "provided no evidence of such an incident that was reported yet went unpunished." Id. The court also relied on the fact that the administrators at the school "met periodically with students and told them that if they experienced any racial harassment to notify a teacher or school administrator so the problem could be addressed." Id. Additionally, the school had "instructed the general student population that the use of racial slurs was unacceptable." Id. The court relied on these proactive actions as evidence demonstrating the school was not deliberately indifferent, and dismissed the Title VI claim. Id.

In Zeno v. Pine Plains Central School District, the plaintiff was subjected to numerous incidents at his "racially homogenous" high school "where minorities represented less than five percent of the student population." 702 F.3d 655, 659–61 (2d Cir. 2012). During his freshman year, the plaintiff was verbally assaulted and called a "nigger." Id. at 659. The plaintiff's mother reported the incident, but was told that she should avoid burning bridges. Id. Subsequently, the

plaintiff endured numerous racial comments and harassment, including physical assaults, like a student stripping a necklace from his neck.  Id.  The plaintiff's mother complained again, but no action was taken.  Id.  The evidence showed that "[b]eyond disciplining each student involved in the incidents . . . with a warning or suspension, the [school district] did not implement other remedial measures in response to the student harassment" of the plaintiff.  Id.  During the following years, the verbal and physical assaults became significantly worse, and the plaintiff's mother reported them to the district with little response; all the district did was implement a couple of programs that did not focus on racial bias or prejudice to which attendance was optional and organized a mediation between the plaintiff's mother and his harassers' parents of which it did not inform the plaintiff's mother.  Id. at 660, 670.  The Second Circuit found that a school would be liable for student-on-student harassment when it exercises substantial control over the circumstances of the harassment, meaning when it "occurs during school hours on school grounds."  Id. at 665 (citing Davis, 526 U.S. at 646).  The court held that the school district's response amounted to deliberate indifference.  Id. at 671.

Plaintiffs allege the events at Marion created a racially hostile environment at Marion ISD.  The Court finds that although the events to which

Kyana, Kyra, and Kavin did not occur daily or even weekly, they nonetheless did create a racially hostile environment.

As evidence of the racially hostile environment, the Court first notes that ultimately, Kavin, Kyra, and Kyana each withdrew from Marion ISD because they could no longer tolerate the environment.  Additionally, as in <u>Zeno</u>, the Court finds that the use of one of the most heinous racial epithets against these three young women easily exceeds characterization as the teasing of school children. Based on the multiple instances of student harassment, the Court finds that there was a racially hostile environment.

Once a racially hostile environment is established, the plaintiffs must also demonstrate that this environment was linked to a denial of educational opportunities.  <u>Couch</u>, 843 F. Supp. 2d at 908.  Here, there is evidence in the record that the racially hostile environment did affect the Kyra's, Kyana's, and Kavin's ability to obtain educational opportunities.  Kyana eventually completed her work in an office next to a guidance counselor's, and Kavin had to be escorted between the middle school and high school to feel safe.

2.    <u>Notice</u>

A plaintiff must also show that the school district had notice of the racially hostile environment.  59 Fed. Reg. at 11449.  Here, the record contains sufficient evidence that Marion had actual knowledge.  The sisters reported nearly

39

all of the incidents they experienced to school teachers or administrators, Ms.
Fennell-Kinney filed multiple grievances with Marion ISD, and Ms.
Fennell-Kinney met with the school administrators on multiple occasions.  The
Court finds that Marion had actual notice of the racially hostile environment.

### 3.   The School's Response

When faced with a racially hostile environment, a school has a duty to
respond appropriately.  Watson, 2008 WL 4279602, *11.  The school "has a legal
duty to take reasonable steps to eliminate a racially hostile environment."
Gomiller v. Dees, No. 4:06CV33–D–B, 2007 WL 1031359, at *4 (N.D. Miss. Mar.
29, 2007).  To demonstrate that a school did not take reasonable steps to eliminate
a racially hostile environment, a plaintiff must show that the school's response
amounted to deliberate indifference and was "clearly unreasonable in light of the
known circumstances."  Maislin v. Tenn. State Univ., 665 F. Supp. 2d 922, 931
(M.D. Tenn. 2009) (internal citations and quotation marks omitted).

As discussed above, in Watson, the court found that a school's
response was not deliberately indifferent when, after a middle-school student used
racial epithets, the school suspended the student and instructed its students that the
use of racial slurs was unacceptable.  2008 WL 4279602, at *11.  Similarly, in
Gomiller, the Court found that a school was not deliberately indifferent when it
took "immediate steps to investigate and eliminate the racially hostile

environment." 2007 WL 1031359, at *4.  In <u>Gomiller</u>, a teacher used a racial epithet when referring to a student.  <u>Id.</u> at *1.  When the school learned of this occurrence, the school district immediately began an investigation and suspended the teacher without pay pending a school board hearing.  <u>Id.</u>

Here, Marion was on notice of incidents including racial slurs directed at plaintiffs, Facebook postings made about the students, allegations that teachers were treating these three students differently because of their race, the videotaping of Kavin's cheerleading tryouts, racially motivated text messages, and two incidents of nooses being placed in the lockers of African-American students.

Although Plaintiffs claim the school did nothing in response to the racial harassment directed at Plaintiffs, the evidence speaks to the contrary.  As discussed above and outlined in Marion's response to Plaintiffs' grievances, Marion did take a number of measures to eliminate the racially hostile environment.  Marion consulted with the NAACP and subsequently brought in the Department of Justice to assist with cultural sensitivity training, in addition to the training Marion already provided.  (Dkt. # 37-6 15:13–16:4.)  When Kavin notified Marion that she felt unsafe on campus after the noose incident, Marion assigned a staff member to walk with her and escort her around campus.  (Dkt. # 37-4 87:12–88:3.)  Similarly, when Kyana felt anxious at school, Marion created a plan for

Kyana that allowed her to work in a counselor's office to ensure that she could complete her studies and graduate with her class.  (Dkt. # 37-2 87:11–24.)

Additionally, Marion responded adequately to the incidents of racial harassment.  Marion's actions appear to have prevented students who uttered racial slurs from subsequently repeating them.  Similarly, in response to the second noose incident, arguably the most severe, the school began investigating immediately to attempt to discover the perpetrator.  Marion involved its campus police officers in the investigation, and eventually the FBI.  However, Kyana refused to pursue the matter further, and the local investigation was dropped.  The Court finds that Marion responded reasonably to the incident.  School officials took it seriously and involved the authorities.  Marion held mandatory trainings for the teachers and assemblies for its students aimed at creating awareness of racism and preventing further racial harassment.  Additionally, Marion took steps to ensure the protection of these students:  when Kavin felt unsafe, the school assigned a teacher to walk with her; when students used racial epithets, the school contacted the student's parents and each girl reported that she had no further incidents after the topic was addressed.

As in <u>Gomiller</u> and <u>Watson</u>, once on notice of a racially hostile environment, Marion took immediate steps to remedy the problem.  When a noose was discovered in the parking lot by Kyana's car, Marion immediately began

investigating the problem.  When individuals used racial epithets, the school

quickly addressed the problem and issued reasonable punishments.  Additionally,

Marion implemented broader measures, including additional sensitivity training to

address the culture of Marion as a whole.

Marion took reasonable measures to remedy the discrimination and

harassment that Kyra, Kyana, and Kavin endured.  The fact that harassment

continued, in this instance, and that it was perpetrated by different individuals,

appears to this Court to be more reflective of some of the students, that Marion, as

a public school, had a duty to educate.  The Court notes that these instances of

racial harassment, although serious, were disbursed over more than a decade.  It

appears to the Court that these unfortunate events are isolated incidents reflecting

the bigoted views of a few individual students rather than of the culture of Marion

as a whole.  Similarly, the fact that there were repeated incidents of racial

harassment does not appear to stem from any deliberate indifference on the part of

Marion, or lack of appropriate response.  As a public school, Marion cannot

control who it is bound to educate, and when racist attitudes are already ingrained

in a segment of the students it serves, Marion has an obligation to take reasonable

steps to eliminate the racially hostile environment; and Marion has done so.  It is

unrealistic, and the Court declines, to hold Marion liable for the bigoted remarks of

individual students when Marion has made substantial efforts to prevent that type of conduct.[7]

The Court finds that Marion was not deliberately indifferent to the racially hostile environment, and therefore, Plaintiffs cannot sustain a claim under Title VI.  The Court **GRANTS** Defendants' Motion for Summary Judgment on this claim.

<u>CONCLUSION</u>

For the reasons given above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Dkt. # 37).

IT IS SO ORDERED.

DATED: San Antonio, Texas, August 28, 2014.

_____

David Alan Ezra
Senior United States Distict Judge

---

[7] The Court finds the use of racial epithets or discriminatory treatment to be abhorrent and intolerable at any level.